# BUTZ ET AL. *v.* ECONOMOU ET AL.

No. 76–709. Argued November 7, 1977—Decided June 29, 1978

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined. REHNQUIST, J., filed an opinion, concurring in part and dissenting in part, in which BURGER, C. J., and STEWART and STEVENS, JJ., joined, *post,* p. 517.

*Deputy Solicitor General Friedman* argued the cause for petitioners. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Babcock, Robert E. Kopp,* and *Barbara L. Herwig.*

*David C. Buxbaum* argued the cause and filed a brief for respondents.

MR. JUSTICE WHITE delivered the opinion of the Court.

This case concerns the personal immunity of federal officials in the Executive Branch from claims for damages arising from their violations of citizens' constitutional rights. Respondent[1] filed suit against a number of officials in the Department of Agriculture claiming that they had instituted an investigation and an administrative proceeding against him in retaliation for his criticism of that agency. The District Court dismissed the action on the ground that the individual defendants, as federal officials, were entitled to absolute immunity for all discretionary acts within the scope of their authority. The Court of Appeals reversed, holding that the defendants were entitled only to the qualified immunity available to their counterparts in state government. *Economou* v. *U. S. Department of Agriculture,* 535 F. 2d 688 (1976). Because of

---

[1] The individual Arthur N. Economou, his corporation Arthur N. Economou and Co., and another corporation which he heads, the American Board of Trade, Inc., were all plaintiffs in this action and are all respondents in this Court. For convenience, however, we refer to Arthur N. Economou and his interests in the singular, as "respondent."

the importance of immunity doctrine to both the vindication of constitutional guarantees and the effective functioning of government, we granted certiorari. 429 U. S. 1089.

## I

Respondent controls Arthur N. Economou and Co., Inc., which was at one time registered with the Department of Agriculture as a commodity futures commission merchant. Most of respondent's factual allegations in this lawsuit focus on an earlier administrative proceeding in which the Department of Agriculture sought to revoke or suspend the company's registration. On February 19, 1970, following an audit, the Department of Agriculture issued an administrative complaint alleging that respondent, while a registered merchant, had willfully failed to maintain the minimum financial requirements prescribed by the Department. After another audit, an amended complaint was issued on June 22, 1970. A hearing was held before the Chief Hearing Examiner of the Department, who filed a recommendation sustaining the administrative complaint. The Judicial Officer of the Department, to whom the Secretary had delegated his decisional authority in enforcement proceedings, affirmed the Chief Hearing Examiner's decision. On respondent's petition for review, the Court of Appeals for the Second Circuit vacated the order of the Judicial Officer. It reasoned that "the essential finding of willfulness . . . was made in a proceeding instituted without the customary warning letter, which the Judicial Officer conceded might well have resulted in prompt correction of the claimed insufficiencies." *Economou* v. *U. S. Department of Agriculture,* 494 F. 2d 519 (1974).

While the administrative complaint was pending before the Judicial Officer, respondent filed this lawsuit in Federal District Court. Respondent sought initially to enjoin the progress of the administrative proceeding, but he was unsuccessful in that regard. On March 31, 1975, respondent filed a second

amended complaint seeking damages. Named as defendants were the individuals who had served as Secretary and Assistant Secretary of Agriculture during the relevant events; the Judicial Officer and Chief Hearing Examiner; several officials in the Commodity Exchange Authority; [2] the Agriculture Department attorney who had prosecuted the enforcement proceeding; and several of the auditors who had investigated respondent or were witnesses against respondent.[3]

The complaint stated that prior to the issuance of the administrative complaints respondent had been "sharply critical of the staff and operations of Defendants and carried on a vociferous campaign for the reform of Defendant Commodity Exchange Authority to obtain more effective regulation of commodity trading." App. 157–158. The complaint also stated that, some time prior to the issuance of the February 19 complaint, respondent and his company had ceased to engage in activities regulated by the defendants. The complaint charged that each of the administrative complaints had been issued without the notice or warning required by law; that the defendants had furnished the complaints "to interested persons and others without furnishing respondent's answers as well"; and that following the issuance of the amended complaint, the defendants had issued a "deceptive" press release that "falsely indicated to the public that [respondent's] financial resources had deteriorated, when Defendants knew that their statement was untrue and so acknowledge[d] previously that said assertion was untrue." *Ibid.*[4]

The complaint then presented 10 "causes of action," some

---

[2] These individuals included the Administrator of the Commodity Exchange Authority, the Director of its Compliance Division, the Deputy Director of its Registration and Audit Division, and the Regional Administrator for the New York Region.

[3] Also named as defendants were the United States, the Department of Agriculture and the Commodity Exchange Authority.

[4] More detailed allegations concerning many of the incidents charged in the complaint were contained in an affidavit filed by respondent in connection with his earlier efforts to obtain injunctive relief.

of which purported to state claims for damages under the United States Constitution. For example, the first "cause of action" alleged that respondent had been denied due process of law because the defendants had instituted unauthorized proceedings against him without proper notice and with the knowledge that respondent was no longer subject to their regulatory jurisdiction. The third "cause of action" stated that by means of such actions "the Defendants discouraged and chilled the campaign of criticism [plaintiff] directed against them, and thereby deprived the [plaintiff] of [his] rights to free expression guaranteed by the First Amendment of the United States Constitution." [5]

The defendants moved to dismiss the complaint on the ground that "as to the individual defendants it is barred by the doctrine of official immunity . . . ." *Id.*, at 163. The defendants relied on an affidavit submitted earlier in the litigation by the attorney who had prosecuted the original administrative complaint against respondent. He stated that the Secretary of Agriculture had had no involvement with the case and that each of the other named defendants had acted "within the course of his official duties." *Id.*, at 142–149.

The District Court, apparently relying on the plurality opinion in *Barr* v. *Matteo,* 360 U. S. 564 (1959), held that the individual defendants would be entitled to immunity if they could show that "their alleged unconstitutional acts were

---

[5] In the second "cause of action," respondent stated that the defendants had issued administrative orders "illegal and punitive in nature" against him when he was no longer subject to their authority. The fourth "cause of action" alleged, *inter alia,* that respondent's rights to due process of law and to privacy as guaranteed by the Federal Constitution had been infringed by the furnishing of the administrative complaints to interested persons without respondent's answers. The fifth "cause of action" similarly alleged as a violation of due process that defendants had issued a press release containing facts the defendants knew or should have known were false. Respondent's remaining "causes of action" allege common-law torts: abuse of legal process, malicious prosecution, invasion of privacy, negligence, and trespass.

within the outer perimeter of their authority and discretionary." App. to Pet. for Cert. 25a. After examining the nature of the acts alleged in the complaint, the District Court concluded: "Since the individual defendants have shown that their alleged unconstitutional acts were both within the scope of their authority and discretionary, we dismiss the second amended complaint as to them." [6] *Id.*, at 28a.

The Court of Appeals for the Second Circuit reversed the District Court's judgment of dismissal with respect to the individual defendants. *Economou* v. *U. S. Department of Agriculture,* 535 F. 2d 688 (1976). The Court of Appeals reasoned that *Barr* v. *Matteo, supra,* did not "represen[t] the last word in this evolving area," 535 F. 2d, at 691, because principles governing the immunity of officials of the Executive Branch had been elucidated in later decisions dealing with constitutional claims against state officials. *E. g., Pierson* v. *Ray,* 386 U. S. 547 (1967); *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974); *Wood* v. *Strickland,* 420 U. S. 308 (1975). These opinions were understood to establish that officials of the Executive Branch exercising discretionary functions did not need the protection of an absolute immunity from suit, but only a qualified immunity based on good faith and reasonable grounds. The Court of Appeals rejected a proposed distinction between suits against state officials sued pursuant to 42 U. S. C. § 1983 and suits against federal officials under the Constitution, noting that "[o]ther circuits have also concluded that the Supreme Court's development of official immunity doctrine in § 1983 suits against state officials applies with equal force to federal officers sued on a cause of action derived directly from the Constitution, since both types of suits serve the same function of protecting citizens against violations of their constitutional rights by government officials." 535 F. 2d, at 695 n. 7. The Court of Appeals recog-

---

[6] The District Court held that the complaint was barred as to the Government agency defendants by the doctrine of sovereign immunity.

nized that under *Imbler* v. *Pachtman,* 424 U. S. 409 (1976), state prosecutors were entitled to absolute immunity from § 1983 damages liability but reasoned that Agriculture Department officials performing analogous functions did not require such an immunity because their cases turned more on documentary proof than on the veracity of witnesses and because their work did not generally involve the same constraints of time and information present in criminal cases. 535 F. 2d, at 696 n. 8. The court concluded that all of the defendants were "adequately protected by permitting them to avail themselves of the defense of qualified 'good faith, reasonable grounds' immunity of the type approved by the Supreme Court in *Scheuer* and *Wood.*" *Id.,* at 696. After noting that summary judgment would be available to the defendants if there were no genuine factual issues for trial, the Court of Appeals remanded the case for further proceedings.

## II

The single submission by the United States on behalf of petitioners is that all of the federal officials sued in this case are absolutely immune from any liability for damages even if in the course of enforcing the relevant statutes they infringed respondent's constitutional rights and even if the violation was knowing and deliberate. Although the position is earnestly and ably presented by the United States, we are quite sure that it is unsound and consequently reject it.

In *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), the victim of an arrest and search claimed to be violative of the Fourth Amendment brought suit for damages against the responsible federal agents. Repeating the declaration in *Marbury* v. *Madison,* 1 Cranch 137, 163 (1803), that " '[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws,' " 403 U. S., at 397, and stating that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty," *id.,* at 395, we rejected the claim

that the plaintiff's remedy lay only in the state court under state law, with the Fourth Amendment operating merely to nullify a defense of federal authorization. We held that a violation of the Fourth Amendment by federal agents gives rise to a cause of action for damages consequent upon the unconstitutional conduct. *Ibid.*[7]

*Bivens* established that compensable injury to a constitutionally protected interest could be vindicated by a suit for damages invoking the general federal-question jurisdiction of the federal courts,[8] but we reserved the question whether the agents involved were "immune from liability by virtue of their official position," and remanded the case for that determination. On remand, the Court of Appeals for the Second Circuit, as has every other Court of Appeals that has faced the question,[9] held that the agents were not absolutely immune and that the public interest would be sufficiently protected by according the agents and their superiors a qualified immunity.

In our view, the Courts of Appeals have reached sound results. We cannot agree with the United States that our prior cases are to the contrary and support the rule it now urges us to embrace. Indeed, as we see it, the Government's

---

[7] Although we had noted in *Bell* v. *Hood,* 327 U. S. 678 (1946), that "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief," *id.,* at 684, the specific question faced in *Bivens* had been reserved.

[8] The Court's opinion in *Bivens* concerned only a Fourth Amendment claim and therefore did not discuss what other personal interests were similarly protected by provisions of the Constitution. We do not consider that issue here. Cf. *Doe* v. *McMillan,* 412 U. S. 306, 325 (1973).

[9] *Black* v. *United States,* 534 F. 2d 524 (CA2 1976); *States Marine Lines* v. *Shultz,* 498 F. 2d 1146 (CA4 1974); *Mark* v. *Groff,* 521 F. 2d 1376 (CA9 1975); *G. M. Leasing Corp.* v. *United States,* 560 F. 2d 1011 (CA10 1977); *Apton* v. *Wilson,* 165 U. S. App. D. C. 22, 506 F. 2d 83 (1974); see *Paton* v. *La Prade,* 524 F. 2d 862 (CA3 1975); *Weir* v. *Muller,* 527 F. 2d 872 (CA5 1976); *Brubaker* v. *King,* 505 F. 2d 534 (CA7 1974); *Jones* v. *United States,* 536 F. 2d 269 (CA8 1976).

submission is contrary to the course of decision in this Court from the very early days of the Republic.

The Government places principal reliance on *Barr* v. *Matteo*, 360 U. S. 564 (1959). In that case, the acting director of an agency had been sued for malicious defamation by two employees whose suspension for misconduct he had announced in a press release. The defendant claimed an absolute or qualified privilege, but the trial court rejected both and the jury returned a verdict for plaintiff.

In the 1958 Term,[10] the Court granted certiorari in *Barr* "to determine whether in the circumstances of this case petitioner's claim of absolute privilege should have stood as a bar to maintenance of the suit despite the allegations of malice made in the complaint." *Id.*, at 569. The Court was divided in reversing the judgment of the Court of Appeals, and there was no opinion for the Court.[11] The plurality opinion inquired whether the conduct complained of was among those

---

[10] The case had been before the Court once before, during the 1957 Term. After the trial, the defendant had appealed only the denial of an absolute privilege. The Court of Appeals affirmed the judgment against him on the ground that the press release exceeded his authority. *Barr* v. *Matteo*, 100 U. S. App. D. C. 319, 244 F. 2d 767 (1957). This Court vacated that judgment, 355 U. S. 171 (1957), directing the Court of Appeals to consider the qualified-privilege question. This the Court of Appeals did, 103 U. S. App. D. C. 176, 256 F. 2d 890 (1958), holding as this Court described it, that "the press release was protected by a qualified privilege, but that there was evidence from which a jury could reasonably conclude that petitioner had acted maliciously, or had spoken with lack of reasonable grounds for believing that his statement was true, and that either conclusion would defeat the qualified privilege." 360 U. S., at 569. Because the case was remanded for a new trial, the defendant sought certiorari a second time.

[11] Mr. Justice Harlan's opinion in *Barr* was joined by three other Justices. The majority was formed through the concurrence in the judgment of Mr. Justice Black, who emphasized in a separate opinion the strong public interest in encouraging federal employees to ventilate their ideas about how the Government should be run. *Id.*, at 576.

"matters committed by law to [the official's] control" and concluded, after an analysis of the specific circumstances, that the press release was within the "outer perimeter of [his] line of duty" and was "an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." *Id.*, at 575. The plurality then held that under *Spalding* v. *Vilas*, 161 U. S. 483 (1896), the act was privileged and that the officer could not be held liable for the tort of defamation despite the allegations of malice.[12] *Barr* clearly held that a false and damaging publication, the issuance of which was otherwise within the official's authority, was not itself actionable and would not become so by being issued maliciously. The Court did not choose to discuss whether the director's privilege would be defeated by showing that he was without reasonable grounds for believing his release was true or that he knew that it was false, although the issue was in the case as it came from the Court of Appeals.[13]

---

[12] The Court wrote a similar opinion and entered a similar judgment in a companion case, *Howard* v. *Lyons*, 360 U. S. 593 (1959). There a complaint for defamation under state law alleged the publication of a deliberate and knowing falsehood by a federal officer. Judgment was entered for the officer before trial on the ground that the release was within the limits of his authority. The judgment was reversed in part by the Court of Appeals on the ground that in some respects the defendant was entitled to only a qualified privilege. This Court reversed, ruling that *Barr* controlled.

[13] See n. 10, *supra*. The question presented in the Government's petition for certiorari was broadly framed:

"Whether the absolute immunity from defamation suits, accorded officials of the Government with respect to acts done within the scope of their official authority, extends to statements to the press by high policy-making officers, below cabinet or comparable rank, concerning matters committed by law to their control or supervision." Pet. for Cert. in *Barr* v. *Matteo*, O. T. 1958, No. 350, p. 2.

This question might be viewed as subsuming the question whether the official's immunity extended to situations in which the official had no reasonable grounds for believing that a statement was true.

*Barr* does not control this case. It did not address the liability of the acting director had his conduct not been within the outer limits of his duties, but from the care with which the Court inquired into the scope of his authority, it may be inferred that had the release been unauthorized, and surely if the issuance of press releases had been expressly forbidden by statute, the claim of absolute immunity would not have been upheld. The inference is supported by the fact that MR. JUSTICE STEWART, although agreeing with the principles announced by Mr. Justice Harlan, dissented and would have rejected the immunity claim because the press release, in his view, was not action in the line of duty. 360 U. S., at 592. It is apparent also that a quite different question would have been presented had the officer ignored an express statutory or constitutional limitation on his authority.

*Barr* did not, therefore, purport to depart from the general rule, which long prevailed, that a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers. The immunity of federal executive officials began as a means of protecting them in the execution of their federal statutory duties from criminal or civil actions based on state law. See *Osborn* v. *Bank of the United States,* 9 Wheat. 738, 865–866 (1824).[14] A federal

---

[14] Mr. Chief Justice Marshall explained:

"An officer, for example, is ordered to arrest an individual. It is not necessary, nor is it usual, to say that he shall not be punished for obeying this order. His security is implied in the order itself. It is no unusual thing for an act of congress to imply, without expressing, this very exemption from State control . . . . The collectors of the revenue, the carriers of the mail, the mint establishment, and all those institutions which are public in their nature, are examples in point. It has never been doubted that all who are employed in them are protected while in the line of duty; and yet this protection is not expressed in any act of congress. It is incidental to, and is implied in, the several acts by which these institutions are created, and is secured to the individuals employed in them by the judicial power alone . . . ."

official who acted outside of his federal statutory authority would be held strictly liable for his trespassory acts. For example, *Little* v. *Barreme,* 2 Cranch 170 (1804), held the commander of an American warship liable in damages for the seizure of a Danish cargo ship on the high seas. Congress had directed the President to intercept any vessels reasonably suspected of being en route *to* a French port, but the President had authorized the seizure of suspected vessels whether going *to* or *from* French ports, and the Danish vessel seized was en route *from* a forbidden destination. The Court, speaking through Mr. Chief Justice Marshall, held that the President's instructions could not "change the nature of the transaction, or legalize an act which, without those instructions, would have been a plain trespass." *Id.,* at 179. Although there was probable cause to believe that the ship was engaged in traffic with the French, the seizure at issue was not among that class of seizures that the Executive had been authorized by statute to effect. See also *Wise* v. *Withers,* 3 Cranch 331 (1806).

*Bates* v. *Clark,* 95 U. S. 204 (1877), was a similar case. The relevant statute directed seizures of alcoholic beverages in Indian country, but the seizure at issue, which was made upon the orders of a superior, was not made in Indian country. The "objection fatal to all this class of defenses is that in that locality [the seizing officers] were utterly without any authority in the premises" and hence were answerable in damages. *Id.,* at 209.

As these cases demonstrate, a federal official was protected for action tortious under state law only if his acts were authorized by controlling federal law. "To make out his defence he must show that his authority was sufficient in law to protect him." *Cunningham* v. *Macon & Brunswick R. Co.,* 109 U. S. 446, 452 (1883); *Belknap* v. *Schild,* 161 U. S. 10, 19 (1896). Since an unconstitutional act, even if authorized by statute, was viewed as not authorized in contemplation of

law, there could be no immunity defense.[15] See *United States v. Lee,* 106 U. S. 196, 218–223 (1882); *Virginia Coupon Cases,* 114 U. S. 269, 285–292 (1885).[16]

In both *Barreme* and *Bates,* the officers did not merely mistakenly conclude that the circumstances warranted a particular seizure, but failed to observe the limitations on their authority by making seizures not within the category or type of seizures they were authorized to make. *Kendall* v. *Stokes,* 3 How. 87 (1845), addressed a different situation. The case involved a suit against the Postmaster General for erroneously suspending payments to a creditor of the Post Office. Examining and, if necessary, suspending payments to creditors were among the Postmaster's normal duties, and it appeared that he had simply made a mistake in the exercise of the discretion conferred upon him. He was held not liable in damages since "a public officer, acting to the best of his judgment and from a sense of duty, in a matter of account with an individual [is not] liable in an action for an error of judgment." *Id.,* at 97–98. Having "the right to examine into this account" and the right to suspend it in the proper circumstances, *id.,* at 98, the officer was not liable in damages if he fell into error, provided, however, that he acted "from a sense of public duty and without malice." *Id.,* at 99.

Four years later, in a case involving military discipline, the Court issued a similar ruling, exculpating the defendant

---

[15] Indeed, there appears to have been some doubt as to whether even an Act of Congress would immunize federal officials from suits seeking damages for constitutional violations. See *Milligan* v. *Hovey,* 17 F. Cas. 380 (No. 9,605) (CC Ind. 1871); *Griffin* v. *Wilcox,* 21 Ind. 370, 372–373 (1863). See generally Engdahl, Immunity and Accountability for Positive Governmental Wrongs, 44 U. Colo. L. Rev. 1, 50–51 (1972).

[16] While the *Virginia Coupon Cases,* like *United States* v. *Lee,* involved a suit for the return of specific property, the principles espoused therein are equally applicable to a suit for damages and were later so applied. *Atchison, Topeka & Santa Fe R. Co.* v. *O'Connor,* 223 U. S. 280, 287 (1912).

officer because of the failure to prove that he had exceeded his jurisdiction or had exercised it in a malicious or willfully erroneous manner: "[I]t is not enough to show he committed an error of judgment, but it must have been a malicious and wilful error." *Wilkes* v. *Dinsman*, 7 How. 89, 131 (1849).

In *Spalding* v. *Vilas*, 161 U. S. 483 (1896), on which the Government relies, the principal issue was whether the malicious motive of an officer would render him liable in damages for injury inflicted by his official act that otherwise was within the scope of his authority. The Postmaster General was sued for circulating among the postmasters a notice that assertedly injured the reputation of the plaintiff and interfered with his contractual relationships. The Court first inquired as to the Postmaster General's authority to issue the notice. In doing so, it "recognize[d] a distinction between action taken by the head of a Department in reference to matters which are manifestly or palpably beyond his authority, and action having more or less connection with the general matters committed by law to his control or supervision." *Id.,* at 498. Concluding that the circular issued by the Postmaster General "was not unauthorized by law, nor beyond the scope of his official duties," the Court then addressed the major question in the case—whether the action could be "maintained because of the allegation that what the officer did was done maliciously?" *Id.,* at 493. Its holding was that the head of a department could not be "held liable to a civil suit for damages on account of official communications made by him pursuant to an act of Congress, and in respect of matters within his authority," however improper his motives might have been. *Id.,* at 498. Because the Postmaster General in issuing the circular in question "did not exceed his authority, nor pass the line of his duty," *id.,* at 499, it was irrelevant that he might have acted maliciously.[17]

[17] An individual might be viewed as acting maliciously where "the circumstances show that he is not disagreeably impressed by the fact that

*Spalding* made clear that a malicious intent will not subject a public officer to liability for performing his authorized duties as to which he would otherwise not be subject to damages liability.[18] But *Spalding* did not involve conduct manifestly or otherwise beyond the authority of the official, nor did it involve a mistake of either law or fact in construing or applying the statute.[19] It did not purport to immunize officials

---

his action injuriously affects the claims of particular individuals." 161 U. S., at 499.

[18] In addressing the liability of the Postmaster General, the Court referred to *Bradley* v. *Fisher*, 13 Wall. 335 (1872), which the Court described as holding that "judges of courts of superior or general jurisdiction [are] not liable to civil suits for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." 161 U. S., at 493. The Court was of the view that "the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law." *Id.*, at 498. The Court plainly applied *Bradley* v. *Fisher* principles in holding that proof of malice would not subject an executive officer to liability for performing an act which he was authorized to perform by federal law. These principles, however, were not said to be completely applicable; and, as indicated in the text, the Court revealed no intention to overrule *Kendall* v. *Stokes* or *Wilkes* or to immunize an officer from liability for a willful misapplication of his authority. Also, on the face of the *Spalding* opinion, it would appear that an executive officer would be vulnerable if he took action "manifestly or palpably" beyond his authority or ignored a clear limitation on his enforcement powers.

[19] MR. JUSTICE BRENNAN, dissenting in *Barr* v. *Matteo*, 360 U. S., at 587 n. 3, emphasized this point:

"The suit in *Spalding* seems to have been as much, if not more, a suit for malicious interference with advantageous relationships as a libel suit. The Court reviewed the facts and found no false statement. See 161 U. S., at 487–493. The case may stand for no more than the proposition that where a Cabinet officer publishes a statement, not factually inaccurate, relating to a matter within his Department's competence, he can-

who ignore limitations on their authority imposed by law. Although the "manifestly or palpably" standard for examining the reach of official power may have been suggested as a gloss on *Barreme, Bates, Kendall,* and *Wilkes,* none of those cases was overruled.[20] It is also evident that *Spalding* presented no claim that the officer was liable in damages because he had acted in violation of a limitation placed upon his conduct by the United States Constitution. If any inference is to be drawn from *Spalding* in any of these respects, it is that the official would not be excused from liability if he failed to observe obvious statutory or constitutional limitations on his powers or if his conduct was a manifestly erroneous application of the statute.

Insofar as cases in this Court dealing with the immunity or privilege of federal officers are concerned,[21] this is where the matter stood until *Barr* v. *Matteo.* There, as we have set out above, immunity was granted even though the publication contained a factual error, which was not the case in *Spalding.* The plurality opinion and judgment in *Barr* also appear—

---

not be charged with improper motives in publication. The Court's opinion leaned heavily on the fact that the contents of the statement (which were not on their face defamatory) were quite accurate, in support of its conclusion that publishing the statement was within the officer's discretion, foreclosing inquiry into his motives. *Id.,* at 489–493."

The *Barr* plurality did not disagree with this characterization of the lawsuit in *Spalding.* See also Gray, Private Wrongs of Public Servants, 47 Calif. L. Rev. 303, 336 (1959).

[20] Indeed, *Barreme* and *Bates* were cited with approval in a decision that was under submission with *Spalding* and was handed down a scant month before the judgment in *Spalding* was announced. *Belknap* v. *Schild,* 161 U. S. 10, 18 (1896).

[21] During the period prior to *Barr,* the lower federal courts broadly extended *Spalding* in according absolute immunity to federal officials sued for common-law torts. *E. g., Jones* v. *Kennedy,* 73 App. D. C. 292, 121 F. 2d 40, cert. denied, 314 U. S. 665 (1941); *Papagianakis* v. *The Samos,* 186 F. 2d 257 (CA4 1950), cert. denied, 341 U. S. 921 (1951). See cases collected in Gray, *supra* n. 19, at 337–338.

although without any discussion of the matter—to have extended absolute immunity to an officer who was authorized to issue press releases, who was assumed to know that the press release he issued was false and who therefore was deliberately misusing his authority. Accepting this extension of immunity with respect to state tort claims, however, we are confident that *Barr* did not purport to protect an official who has not only committed a wrong under local law, but also violated those fundamental principles of fairness embodied in the Constitution.[22] Whatever level of protection from state interference is appropriate for federal officials executing their duties under federal law, it cannot be doubted that these officials, even when acting pursuant to congressional authorization, are subject to the restraints imposed by the Federal Constitution.

The liability of officials who have exceeded constitutional limits was not confronted in either *Barr* or *Spalding*. Neither of those cases supports the Government's position. Beyond that, however, neither case purported to abolish the liability of federal officers for actions manifestly beyond their line of duty; and if they are accountable when they stray beyond the plain limits of their statutory authority, it would be incongruous to hold that they may nevertheless willfully or knowingly violate constitutional rights without fear of liability.

Although it is true that the Court has not dealt with this

---

[22] We view this case, in its present posture, as concerned only with constitutional issues. The District Court memorandum focused exclusively on respondent's constitutional claims. It appears from the language and reasoning of its opinion that the Court of Appeals was also essentially concerned with respondent's constitutional claims. See, *e. g.*, 535 F. 2d, at 695 n. 7. The Second Circuit has subsequently read *Economou* as limited to that context. See *Huntington Towers, Ltd.* v. *Franklin Nat. Bank,* 559 F. 2d 863, 870, and n. 2 (1977), cert. denied *sub nom. Huntington Towers, Ltd.* v. *Federal Reserve Bank of N. Y.,* 434 U. S. 1012 (1978). The argument before us as well has focused on respondent's constitutional claims, and our holding is so limited.

issue with respect to federal officers,[23] we have several times addressed the immunity of state officers when sued under 42 U. S. C. § 1983 for alleged violations of constitutional rights. These decisions are instructive for present purposes.

## III

*Pierson* v. *Ray,* 386 U. S. 547 (1967), decided that § 1983 was not intended to abrogate the immunity of state judges which existed under the common law and which the Court had held applicable to federal judges in *Bradley* v. *Fisher,* 13 Wall. 335 (1872). *Pierson* also presented the issue "whether immunity was available to that segment of the executive branch of a state government that is . . . most frequently exposed to situations which can give rise to claims under § 1983—the local police officer." *Scheuer* v. *Rhodes,* 416 U. S., at 244–245. Relying on the common law, we held that police officers were entitled to a defense of "good faith and probable cause," even though an arrest might subsequently be proved to be unconstitutional. We observed, however, that "[t]he common law has never granted police officers an absolute and unqualified immunity, and the officers in this case do not claim that they are entitled to one." 386 U. S., at 555.

In *Scheuer* v. *Rhodes, supra,* the issue was whether "higher officers of the executive branch" of state governments were immune from liability under § 1983 for violations of constitutionally protected rights. 416 U. S., at 246. There, the Governor of a State, the senior and subordinate officers of the state National Guard, and a state university president had been sued on the allegation that they had suppressed a civil dis-

---

[23] *Doe* v. *McMillan,* 412 U. S. 306 (1973), did involve a constitutional claim for invasion of privacy—but in the special context of the Speech or Debate Clause. The Court held that the executive officials would be immune from suit only to the extent that the legislators at whose behest they printed and distributed the documents could claim the protection of the Speech or Debate Clause.

turbance in an unconstitutional manner. We explained that the doctrine of official immunity from § 1983 liability, although not constitutionally grounded and essentially a matter of statutory construction, was based on two mutually dependent rationales:

"(1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." 416 U. S., at 240.

The opinion also recognized that executive branch officers must often act swiftly and on the basis of factual information supplied by others, constraints which become even more acute in the "atmosphere of confusion, ambiguity, and swiftly moving events" created by a civil disturbance. *Id.*, at 246–247. Although quoting at length from *Barr* v. *Matteo*,[24] we did not believe that there was a need for absolute immunity from § 1983 liability for these high-ranking state officials. Rather the considerations discussed above indicated:

"[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the

---

[24] 416 U. S., at 247, quoting *Barr* v. *Matteo*, 360 U. S., at 573–574. The Court spoke of *Barr* v. *Matteo* as arising "[i]n a context other than a § 1983 suit." 416 U. S., at 247. Elsewhere in the opinion, however, the Court discussed *Barr* as arising "in the somewhat parallel context of the privilege of public officers from defamation actions." 416 U. S., at 242. The Court also relied on *Spalding* v. *Vilas*, 161 U. S. 483 (1896), without mentioning that that decision concerned federal officials. 416 U. S., at 242 n. 7, 246 n. 8.

existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." 416 U. S., at 247–248.

Subsequent decisions have applied the *Scheuer* standard in other contexts. In *Wood* v. *Strickland*, 420 U. S. 308 (1975), school administrators were held entitled to claim a similar qualified immunity. A school board member would lose his immunity from a § 1983 suit only if "he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." 420 U. S., at 322. In *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975), we applied the same standard to the superintendent of a state hospital. In *Procunier* v. *Navarette*, 434 U. S. 555 (1978), we held that prison administrators would be adequately protected by the qualified immunity outlined in *Scheuer* and *Wood*. We emphasized, however, that, at least in the absence of some showing of malice, an official would not be held liable in damages under § 1983 unless the constitutional right he was alleged to have violated was "clearly established" at the time of the violation.

None of these decisions with respect to state officials furnishes any support for the submission of the United States that federal officials are absolutely immune from liability for their constitutional transgressions. On the contrary, with impressive unanimity, the Federal Courts of Appeals have concluded that federal officials should receive no greater degree of protection from *constitutional* claims than their counterparts in state government.[25] Subsequent to *Scheuer*, the

---

[25] As early as 1971, Judge, now Attorney General, Bell, concurring specially in a judgment of the Court of Appeals for the Fifth Circuit,

Court of Appeals for the Fourth Circuit concluded that "[a]lthough *Scheuer* involved a suit against state executive officers, the court's discussion of the qualified nature of executive immunity would appear to be equally applicable to federal executive officers." *States Marine Lines* v. *Shultz,* 498 F. 2d 1146, 1159 (1974). In the view of the Court of Appeals for the Second Circuit,

> "it would be 'incongruous and confusing, to say the least' to develop different standards of immunity for state officials sued under § 1983 and federal officers sued on similar grounds under causes of action founded directly on the Constitution." *Economou* v. *U. S. Dept. of Agriculture,* 535 F. 2d, at 695 n. 7, quoting *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 456 F. 2d 1339, 1346–1347 (CA2 1972) (on remand).[26]

The Court of Appeals for the Ninth Circuit has reasoned:

> "[Defendants] offer no significant reason for distinguishing, as far as the immunity doctrine is concerned, between litigation under § 1983 against state officers and actions against federal officers alleging violation of constitutional rights under the general federal question statute. In contrast, the practical advantage of having just *one* fed-

---

recorded his "continuing belief that all police and ancillary personnel in this nation, whether state or federal, should be subject to the same accountability under law for their conduct." *Anderson* v. *Nosser,* 438 F. 2d 183, 205 (1971). He objected to the notion that there should be "one law for Athens and another for Rome." *Ibid.* It appears from a recent decision that the Fifth Circuit has abandoned the view he criticized. See *Weir* v. *Muller,* 527 F. 2d 872 (1976).

[26] Courts and judges have noted the "incongruity" that would arise if officials of the District of Columbia, who are not subject to § 1983, were given absolute immunity while their counterparts in state government received qualified immunity. *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 456 F. 2d, at 1347; *Carter* v. *Carlson,* 144 U. S. App. D. C. 388, 401, 447 F. 2d 358, 371 (1971) (Nichols, J., concurring), rev'd on other grounds *sub nom. District of Columbia* v. *Carter,* 409 U. S. 418 (1973).

eral immunity doctrine for suits arising under federal law is self-evident. Further, the rights at stake in a suit brought directly under the Bill of Rights are no less worthy of full protection than the constitutional and statutory rights protected by § 1983." *Mark* v. *Groff,* 521 F. 2d 1376, 1380 (1975).

Other courts have reached similar conclusions. *E. g., Apton* v. *Wilson,* 165 U. S. App. D. C. 22, 506 F. 2d 83 (1974); *Brubaker* v. *King,* 505 F. 2d 534 (CA7 1974); see *Weir* v. *Muller,* 527 F. 2d 872 (CA5 1976); *Paton* v. *La Prade,* 524 F. 2d 862 (CA3 1975); *Jones* v. *United States,* 536 F. 2d 269 (CA8 1976); *G. M. Leasing Corp.* v. *United States,* 560 F. 2d 1011 (CA10 1977).[27]

We agree with the perception of these courts that, in the absence of congressional direction to the contrary, there is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement as authorized by *Bivens* than is accorded state officials when sued for the identical violation under § 1983. The constitutional injuries made actionable by § 1983 are of no greater magnitude than those for which federal officials may be responsible. The pressures and uncertainties facing decisionmakers in state government are little if at all different from those affecting federal officials.[28] We see no sense

---

[27] The First and Sixth Circuits have recently accorded immunity to federal officials sued for common-law torts, without discussion of their views with respect to constitutional claims. *Berberian* v. *Gibney,* 514 F. 2d 790 (CA1 1975); *Mandel* v. *Nouse,* 509 F. 2d 1031 (CA6 1975).

[28] In *Apton* v. *Wilson,* 165 U. S. App. D. C. 22, 32, 506 F. 2d 83, 93 (1974), Judge Leventhal compared the Governor of a State with the highest officers of a federal executive department:

"The difference in office is relevant, for immunity depends in part upon 'scope of discretion and responsibilities of the office,' *Scheuer* v. *Rhodes, supra,* 416 U. S., at 247 . . . . But the difference is not conclusive in this case. Like the highest executive officer of a state, the head of a Federal executive department has broad discretionary authority. Each is called

in holding a state governor liable but immunizing the head of a federal department; in holding the administrator of a federal hospital immune where the superintendent of a state hospital would be liable; in protecting the warden of a federal prison where the warden of a state prison would be vulnerable; or in distinguishing between state and federal police participating in the same investigation. Surely, *federal* officials should enjoy no greater zone of protection when they violate *federal* constitutional rules than do *state* officers.

The Government argues that the cases involving state officials are distinguishable because they reflect the need to preserve the effectiveness of the right of action authorized by § 1983. But as we discuss more fully below, the cause of action recognized in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), would similarly be "drained of meaning" if federal officials were entitled to absolute immunity for their constitutional transgressions. Cf. *Scheuer* v. *Rhodes,* 416 U. S., at 248.

Moreover, the Government's analysis would place undue emphasis on the congressional origins of the cause of action in determining the level of immunity. It has been observed more than once that the law of privilege as a defense to damages actions against officers of Government has "in large

upon to act under circumstances where judgments are tentative and an unambiguously optimal course of action can be ascertained only in retrospect. Both officials have functions and responsibilities concerned with maintaining the public order; these may impel both officials to make decisions 'in an atmosphere of confusion, ambiguity, and swiftly moving events.' *Scheuer* v. *Rhodes, supra,* 416 U. S., at 247 . . . . Having a wider territorial responsibility than the head of a state government, a Federal cabinet officer may be entitled to consult fewer sources and expend less effort inquiring into the circumstances of a localized problem. But these considerations go to the showing an officer vested with a qualified immunity must make in support of 'good faith belief;' they do not make the qualified immunity itself inappropriate. The head of an executive department, no less than the chief executive of a state, is adequately protected by a qualified immunity."

part been of judicial making." *Barr* v. *Matteo,* 360 U. S., at 569; *Doe* v. *McMillan,* 412 U. S. 306, 318 (1973). Section 1 of the Civil Rights Act of 1871 [29]—the predecessor of § 1983— said nothing about immunity for state officials. It mandated that any person who under color of state law subjected another to the deprivation of his constitutional rights would be liable to the injured party in an action at law.[30] This

---

[29] Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, provided in pertinent part:

"[A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law . . . ."

[30] The purpose of § 1 of the Civil Rights Act was not to abolish the immunities available at common law, see *Pierson* v. *Ray,* 386 U. S. 547, 554 (1967), but to insure that federal courts would have jurisdiction of constitutional claims against state officials. We explained in *District of Columbia* v. *Carter,* 409 U. S., at 427–428:

"At the time this Act was adopted, . . . there existed no general federal-question jurisdiction in the lower federal courts. Rather, Congress relied on the state courts to vindicate essential rights arising under the Constitution and federal laws.' *Zwickler* v. *Koota,* 389 U. S. 241, 245 (1967). With the growing awareness that this reliance had been misplaced, however, Congress recognized the need for original federal court jurisdiction as a means to provide at least indirect federal control over the unconstitutional actions of state officials." (Footnotes omitted.)

The situation with respect to federal officials was entirely different: They were already subject to judicial control through the state courts, which were not particularly sympathetic to federal officials, or through the removal jurisdiction of the federal courts. See generally *Willingham* v. *Morgan,* 395 U. S. 402 (1969); *Tennessee* v. *Davis,* 100 U. S. 257 (1880). Moreover, in 1875 Congress vested the circuit courts with general federal-question jurisdiction, which encompassed many suits against federal officials. 18 Stat. 470. Thus, the absence of a statute similar to § 1983 pertaining to federal officials cannot be the basis for an inference about the level of immunity appropriate to federal officials.

Court nevertheless ascertained and announced what it deemed to be the appropriate type of immunity from § 1983 liability in a variety of contexts. *Pierson* v. *Ray,* 386 U. S. 547 (1967); *Imbler* v. *Pachtman,* 424 U. S. 409 (1976); *Scheuer* v. *Rhodes, supra.* The federal courts are equally competent to determine the appropriate level of immunity where the suit is a direct claim under the Federal Constitution against a federal officer.

The presence or absence of congressional authorization for suits against federal officials is, of course, relevant to the question whether to infer a right of action for damages for a particular violation of the Constitution. In *Bivens,* the Court noted the "absence of affirmative action by Congress" and therefore looked for "special factors counselling hesitation." 403 U. S., at 396. Absent congressional authorization, a court may also be impelled to think more carefully about whether the type of injury sustained by the plaintiff is normally compensable in damages, *id.,* at 397, and whether the courts are qualified to handle the types of questions raised by the plaintiff's claim, see *id.,* at 409 (Harlan, J., concurring in judgment).

But once this analysis is completed, there is no reason to return again to the absence of congressional authorization in resolving the question of immunity. Having determined that the plaintiff is entitled to a remedy in damages for a constitutional violation, the court then must address how best to reconcile the plaintiff's right to compensation with the need to protect the decisionmaking processes of an executive department. Since our decision in *Scheuer* was intended to guide the federal courts in resolving this tension in the myriad factual situations in which it might arise, we see no reason why it should not supply the governing principles for resolving this dilemma in the case of federal officials. The Court's opinion in *Scheuer* relied on precedents dealing with federal as well as state officials, analyzed the issue of executive im-

munity in terms of general policy considerations, and stated its conclusion, quoted *supra*, in the same universal terms. The analysis presented in that case cannot be limited to actions against state officials.

Accordingly, without congressional directions to the contrary, we deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials. The § 1983 action was provided to vindicate federal constitutional rights. That Congress decided, after the passage of the Fourteenth Amendment, to enact legislation specifically requiring state officials to respond in federal court for their failures to observe the constitutional limitations on their powers is hardly a reason for excusing their federal counterparts for the identical constitutional transgressions. To create a system in which the Bill of Rights monitors more closely the conduct of state officials than it does that of federal officials is to stand the constitutional design on its head.

## IV

As we have said, the decision in *Bivens* established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official. As Mr. Justice Harlan, concurring in the judgment, pointed out, the action for damages recognized in *Bivens* could be a vital means of providing redress for persons whose constitutional rights have been violated. The barrier of sovereign immunity is frequently impenetrable.[31] Injunctive or declaratory relief is useless to a person who has already been injured. "For

---

[31] At the time of the *Bivens* decision, the Federal Tort Claims Act prohibited recovery against the Government for

"Any claim arising out of assault, battery, false imprisonment, false arrest,

people in Bivens' shoes, it is damages or nothing." 403 U. S., at 410.

Our opinion in *Bivens* put aside the immunity question; but we could not have contemplated that immunity would be absolute.[32] If, as the Government argues, all officials exercising discretion were exempt from personal liability, a suit under the Constitution could provide no redress to the injured citizen, nor would it in any degree deter federal officials from committing constitutional wrongs. Moreover, no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused.[33]

The extension of absolute immunity from damages liability to all federal executive officials would seriously erode the protection provided by basic constitutional guarantees. The broad authority possessed by these officials enables them to direct their subordinates to undertake a wide range of projects—including some which may infringe such important personal interests as liberty, property, and free speech. It makes

---

malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U. S. C. § 2680 (h).

The statute was subsequently amended in light of *Bivens* to lift the bar against some of these claims when arising from the act of federal law enforcement officers. See 28 U. S. C. § 2680 (h) (1976 ed.).

[32] Mr. Justice Harlan, the author of the plurality opinion in *Barr*, noted that although "interests in efficient law enforcement . . . argue for a protective zone with respect to many types of Fourth Amendment violations . . . at the very least . . . a remedy would be available for the most flagrant and patently unjustified sorts of police conduct." *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S., at 411 (concurring in judgment).

[33] Pursuant to 28 U. S. C. § 2680 (1976 ed.), the Government is immune from

"(a) Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

See generally *Dalehite* v. *United States,* 346 U. S. 15 (1953).

little sense to hold that a Government agent is liable for warrantless and forcible entry into a citizen's house in pursuit of evidence, but that an official of higher rank who actually orders such a burglary is immune simply because of his greater authority. Indeed, the greater power of such officials affords a greater potential for a regime of lawless conduct. Extensive Government operations offer opportunities for unconstitutional action on a massive scale. In situations of abuse, an action for damages against the responsible official can be an important means of vindicating constitutional guarantees.

Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law:

> "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." *United States* v. *Lee,* 106 U. S., at 220.

See also *Marbury* v. *Madison,* 1 Cranch 137 (1803) ; *Scheuer* v. *Rhodes,* 416 U. S., at 239-240. In light of this principle, federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.

This is not to say that considerations of public policy fail to support a limited immunity for federal executive officials. We consider here, as we did in *Scheuer,* the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority. Yet *Scheuer* and other cases have recognized that it is not unfair to hold liable the official who knows or should know he is acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not

unduly interfere with the exercise of official judgment. We therefore hold that, in a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity specified in *Scheuer,* subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business.[34]

The *Scheuer* principle of only qualified immunity for constitutional violations is consistent with *Barr* v. *Matteo,* 360 U. S. 564 (1959), *Spalding* v. *Vilas,* 161 U. S. 483 (1896), and *Kendall* v. *Stokes,* 3 How. 87 (1847). Federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law. But we see no substantial basis for holding, as the United States would have us do, that executive officers generally may with impunity discharge their duties in a way that is known to them to violate the United States Constitution or in a manner that they should know transgresses a clearly established constitutional rule. The principle should prove as workable in suits against federal officials as it has in the context of suits against state officials. Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief under the Federal Constitution, it should not survive

---

[34] The Government argued in *Bivens* that the plaintiff should be relegated to his traditional remedy at state law. "In this scheme the Fourth Amendment would serve merely to limit the extent to which the agents could defend the state law tort suit by asserting that their actions were a valid exercise of federal power: if the agents were shown to have violated the Fourth Amendment, such a defense would be lost to them and they would stand before the state law merely as private individuals." 403 U. S., at 390–391. Although, as this passage makes clear, traditional doctrine did not accord immunity to officials who transgressed constitutional limits, we believe that federal officials sued by such traditional means should similarly be entitled to a *Scheuer* immunity.

a motion to dismiss. Moreover, the Court recognized in *Scheuer* that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity.[35] See 416 U. S., at 250. In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits.

## V

Although a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations, our decisions recognize that there are some officials whose special functions require a full exemption from liability. *E. g., Bradley* v. *Fisher,* 13 Wall. 335 (1872); *Imbler* v. *Pachtman,* 424 U. S. 409 (1976). In each case, we have undertaken "a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Id.,* at 421.

In *Bradley* v. *Fisher,* the Court analyzed the need for absolute immunity to protect judges from lawsuits claiming that their decisions had been tainted by improper motives. The Court began by noting that the principle of immunity for acts done by judges "in the exercise of their judicial functions" had been "the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country." 13 Wall., at 347. The Court explained that the value of this rule was proved by experience.

---

[35] The defendant official may also be able to assert on summary judgment some other common-law or constitutional privilege. For example, in this case the defendant officials may be able to argue that their issuance of the press release was privileged as an accurate report on a matter of public record in an administrative proceeding. See Handler & Klein, The Defense of Privilege in Defamation Suits Against Government Executive Officials, 74 Harv. L. Rev. 44, 61–62, 75–76 (1960). Of course, we do not decide this issue at this time.

Judges were often called to decide "[c]ontroversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings." *Id.*, at 348. Such adjudications invariably produced at least one losing party, who would "accep[t] anything but the soundness of the decision in explanation of the action of the judge." *Ibid.* "Just in proportion to the strength of his convictions of the correctness of his own view of the case is he apt to complain of the judgment against him, and from complaints of the judgment to pass to the ascription of improper motives to the judge." *Ibid.* If a civil action could be maintained against a judge by virtue of an allegation of malice, judges would lose "that independence without which no judiciary can either be respectable or useful." *Id.*, at 347. Thus, judges were held to be immune from civil suit "for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction." *Id.*, at 354.[36]

The principle of *Bradley* was extended to federal prosecutors through the summary affirmance in *Yaselli* v. *Goff*, 275 U. S. 503 (1927), aff'g 12 F. 2d 396 (CA2 1926). The Court of Appeals in that case discussed in detail the common-law precedents extending absolute immunity to parties participating in the judicial process: judges, grand jurors, petit jurors, advocates, and witnesses. Grand jurors had received absolute immunity " 'lest they should be biased with the fear of being

---

[36] In *Pierson* v. *Ray*, 386 U. S. 547 (1967), we recognized that state judges sued on constitutional claims pursuant to § 1983 could claim a similar absolute immunity. The Court reasoned:

"It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation." *Id.*, at 554.

harassed by a vicious suit for acting according to their consciences (the danger of which might easily be insinuated where powerful men are warmly engaged in a cause and thoroughly prepossessed of the justice of the side which they espouse).'" *Id.,* at 403, quoting 1 W. Hawkins, Pleas of the Crown 349 (6th ed. 1787). The court then reasoned that "'[t]he public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" 12 F. 2d, at 404, quoting *Smith* v. *Parman,* 101 Kan. 115, 116, 165 P. 663 (1917). The court held the prosecutor in that case immune from suit for malicious prosecution and this Court, citing *Bradley* v. *Fisher, supra,* affirmed.

We recently reaffirmed the holding of *Yaselli* v. *Goff* in *Imbler* v. *Pachtman, supra,* a suit against a state prosecutor under § 1983. The Court's examination of the leading precedents led to the conclusion that "[t]he common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties." 424 U. S., at 422–423. The prosecutor's role in the criminal justice system was likely to provoke "with some frequency" retaliatory suits by angry defendants. *Id.,* at 425. A qualified immunity might have an adverse effect on the functioning of the criminal justice system, not only by discouraging the initiation of prosecutions, see *id.,* at 426 n. 24, but also by affecting the prosecutor's conduct of the trial.

> "Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence. . . . If prosecutors were hampered in exercising their judgment as to the use of . . . witnesses by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence." *Id.,* at 426.

In light of these and other practical considerations, the Court held that the defendant in that case was entitled to absolute immunity with respect to his activities as an advocate, "activities [which] were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." *Id.,* at 430.[37]

Despite these precedents, the Court of Appeals concluded that all of the defendants in this case—including the Chief Hearing Examiner, Judicial Officer, and prosecuting attorney—were entitled to only a qualified immunity. The Court of Appeals reasoned that officials within the Executive Branch generally have more circumscribed discretion and pointed out that, unlike a judge, officials of the Executive Branch would face no conflict of interest if their legal representation was provided by the Executive Branch. The Court of Appeals recognized that "some of the Agriculture Department officials may be analogized to criminal prosecutors, in that they initiated the proceedings against [respondent], and presented evidence therein," 535 F. 2d, at 696 n. 8, but found that attorneys in administrative proceedings did not face the same "serious constraints of time and even information" which this Court has found to be present frequently in criminal cases. See *Imbler* v. *Pachtman,* 424 U. S., at 425.

We think that the Court of Appeals placed undue emphasis on the fact that the officials sued here are—from an administrative perspective—employees of the Executive Branch. Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities. This point is underlined by the fact that prosecutors—themselves members of the Exec-

---

[37] The *Imbler* Court specifically reserved the question "whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." 424 U. S., at 430–431.

utive Branch—are also absolutely immune. "It is the functional comparability of their judgments to those of the judge that has resulted in both grand jurors and prosecutors being referred to as 'quasi-judicial' officers, and their immunities being termed 'quasi-judicial' as well." *Id.*, at 423 n. 20.

The cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process rather than its location. As the *Bradley* Court suggested, 13 Wall., at 348–349, controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus. See *Pierson* v. *Ray*, 386 U. S., at 554. Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.

At the same time, the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges.[38] Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.

We think that adjudication within a federal administrative

---

[38] See generally Handler & Klein, *supra* n. 35, at 54–55.

agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages. The conflicts which federal hearing examiners seek to resolve are every bit as fractious as those which come to court. As the *Bradley* opinion points out: "When the controversy involves questions affecting large amounts of property or relates to a matter of general public concern, or touches the interests of numerous parties, the disappointment occasioned by an adverse decision, often finds vent in imputations of [malice]." 13 Wall., at 348. Moreover, federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process. The proceedings are adversary in nature. See 5 U. S. C. § 555 (b) (1976 ed.). They are conducted before a trier of fact insulated from political influence. See § 554 (d). A party is entitled to present his case by oral or documentary evidence, § 556 (d), and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision. § 556 (e). The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record. § 557 (c).

There can be little doubt that the role of the modern federal hearing examiner or administrative law judge within this framework is "functionally comparable" to that of a judge. His powers are often, if not generally, comparable to those of a trial judge: He may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. See § 556 (c). More importantly, the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency. Prior to the Administrative Procedure Act, there was considerable concern that persons hearing administrative cases at the trial level could not exercise independent judgment because

they were required to perform prosecutorial and investigative functions as well as their judicial work, see, *e. g., Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 36–41 (1950), and because they were often subordinate to executive officials within the agency, see *Ramspeck* v. *Federal Trial Examiners Conference,* 345 U. S. 128, 131 (1953). Since the securing of fair and competent hearing personnel was viewed as "the heart of formal administrative adjudication," Final Report of the Attorney General's Committee on Administrative Procedure 46 (1941), the Administrative Procedure Act contains a number of provisions designed to guarantee the independence of hearing examiners. They may not perform duties inconsistent with their duties as hearing examiners. 5 U. S. C. § 3105 (1976 ed.). When conducting a hearing under § 5 of the APA, 5 U. S. C. § 554 (1976 ed.), a hearing examiner is not responsible to, or subject to the supervision or direction of, employees or agents engaged in the performance of investigative or prosecution functions for the agency. 5 U. S. C. § 554 (d)(2) (1976 ed.). Nor may a hearing examiner consult any person or party, including other agency officials, concerning a fact at issue in the hearing, unless on notice and opportunity for all parties to participate. § 554 (d)(1). Hearing examiners must be assigned to cases in rotation so far as is practicable. § 3105. They may be removed only for good cause established and determined by the Civil Service Commission after a hearing on the record. § 7521. Their pay is also controlled by the Civil Service Commission.

In light of these safeguards, we think that the risk of an unconstitutional act by one presiding at an agency hearing is clearly outweighed by the importance of preserving the independent judgment of these men and women. We therefore hold that persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts. Those who complain of error in such proceedings must seek agency or judicial review.

We also believe that agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts. The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought. The Commodity Futures Trading Commission, for example, may initiate proceedings whenever it has "reason to believe" that any person "is violating or has violated any of the provisions of this chapter or of the rules, regulations, or orders of the Commission." 7 U. S. C. § 9 (1976 ed.). A range of sanctions is open to it. *Ibid.*

The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete. Cf. *Imbler* v. *Pachtman,* 424 U. S., at 426 n. 24. While there is not likely to be anyone willing and legally able to seek damages from the officials if they do *not* authorize the administrative proceeding, cf. *id.,* at 438 (WHITE, J., concurring in judgment), there is a serious danger that the decision to authorize proceedings will provoke a retaliatory response. An individual targeted by an administrative proceeding will react angrily and may seek vengeance in the courts. A corporation will muster all of its financial and legal resources in an effort to prevent administrative sanctions. "When millions may turn on regulatory decisions, there is a strong incentive to counter-attack." [39]

The defendant in an enforcement proceeding has ample opportunity to challenge the legality of the proceeding. An

---

[39] *Expeditions Unlimited Aquatic Enterprises, Inc.* v. *Smithsonian Institution,* 184 U. S. App. D. C. 397, 401, 566 F. 2d 289, 293 (1977), cert. pending, No. 76–418.

administrator's decision to proceed with a case is subject to scrutiny in the proceeding itself. The respondent may present his evidence to an impartial trier of fact and obtain an independent judgment as to whether the prosecution is justified. His claims that the proceeding is unconstitutional may also be heard by the courts. Indeed, respondent in this case was able to quash the administrative order entered against him by means of judicial review. See *Economou* v. *U. S. Department of Agriculture,* 494 F. 2d 519 (CA2 1974).

We believe that agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment. Because the legal remedies already available to the defendant in such a proceeding provide sufficient checks on agency zeal, we hold that those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision.

We turn finally to the role of an agency attorney in conducting a trial and presenting evidence on the record to the trier of fact. We can see no substantial difference between the function of the agency attorney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court.[40] In either case, the evidence

---

[40] That prosecutors act under "serious constraints of time and even information" was not central to our decision in *Imbler,* for the same might be said of a wide variety of state and federal officials who enjoy only qualified immunity. See *Scheuer* v. *Rhodes,* 416 U. S., at 246–247. Nor do we think that administrative enforcement proceedings may be distinguished from criminal prosecutions on the ground that the former often turn on documentary proof. The key point is that administrative personnel, like prosecutors, "often must decide, especially in cases of wide public interest, whether to proceed to trial where there is a sharp conflict in the evidence." *Imbler,* 424 U. S., at 426 n. 24. The complexity and quantity of documentary proof that may be adduced in a full-scale enforcement proceeding may make this decision even more difficult than the decision to prosecute a suspect.

will be subject to attack through cross-examination, rebuttal, or reinterpretation by opposing counsel. Evidence which is false or unpersuasive should be rejected upon analysis by an impartial trier of fact. If agency attorneys were held personally liable in damages as guarantors of the quality of their evidence, they might hesitate to bring forward some witnesses or documents. "This is particularly so because it is very difficult if not impossible for attorneys to be absolutely certain of the objective truth or falsity of the testimony which they present." *Imbler* v. *Pachtman, supra,* at 440 (WHITE, J., concurring in judgment). Apart from the possible unfairness to agency personnel, the agency would often be denied relevant evidence. Cf. *Imbler* v. *Pachtman, supra,* at 426. Administrative agencies can act in the public interest only if they can adjudicate on the basis of a complete record. We therefore hold that an agency attorney who arranges for the presentation of evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence.

## VI

There remains the task of applying the foregoing principles to the claims against the particular petitioner-defendants involved in this case. Rather than attempt this here in the first instance, we vacate the judgment of the Court of Appeals and remand the case to that court with instructions to remand the case to the District Court for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE STEVENS join, concurring in part and dissenting in part.

I concur in that part of the Court's judgment which affords absolute immunity to those persons performing adjudicatory functions within a federal agency, *ante,* at 514,

those who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication, *ante,* at 516, and those agency personnel who present evidence on the record in the course of an adjudication, *ante,* at 517. I cannot agree, however, with the Court's conclusion that in a suit for damages arising from allegedly unconstitutional action federal executive officials, regardless of their rank or the scope of their responsibilities, are entitled to only qualified immunity even when acting within the outer limits of their authority. The Court's protestations to the contrary notwithstanding, this decision seriously misconstrues our prior decisions, finds little support as a matter of logic or precedent, and perhaps most importantly, will, I fear, seriously "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties," *Gregoire* v. *Biddle,* 177 F. 2d 579, 581 (CA2 1949) (Learned Hand, J.).

Most noticeable is the Court's unnaturally constrained reading of the landmark case of *Spalding* v. *Vilas,* 161 U. S. 483 (1896). The Court in that case did indeed hold that the actions taken by the Postmaster General were within the authority conferred upon him by Congress, and went on to hold that even though he had acted maliciously in carrying out the duties conferred upon him by Congress he was protected by official immunity. But the Court left no doubt that it would have reached the same result had it been alleged the official acts were unconstitutional.

> "We are of the opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be

accorded to them in respect of their official acts."
*Id.,* at 498.

The Court today attempts to explain away that language by observing that *Spalding* indicated no intention to overrule *Kendall* v. *Stokes,* 3 How. 87 (1845), or *Wilkes* v. *Dinsman,* 7 How. 89 (1849). See *ante,* at 493 n. 18. But as the Court itself observes, the Postmaster General was held *not* "liable in an action for an error of judgment" in *Kendall, supra,* at 98. The Court in *Wilkes, supra,* likewise exonerated the defendant. The Court did indicate in dictum in both those cases that a federal officer might be liable if he acted with malice, *Kendall, supra,* at 99; *Wilkes, supra,* at 131, but the holding in *Spalding* was, as even the Court is forced to admit today, see *ante,* at 492–493, directly contrary to those cases on that point. In short, *Spalding* clearly and inescapably stands for the proposition that high-ranking executive officials acting within the outer limits of their authority are absolutely immune from suit.

Indeed, the language from *Spalding* quoted above unquestionably applies with equal force in the case at bar. No one seriously contends that the Secretary of Agriculture or the Assistant Secretary, who are being sued for $32 million in damages, had wandered completely off the official reservation in authorizing prosecution of respondent for violation of regulations promulgated by the Secretary for the regulation of "futures commission merchants," 7 U. S. C. § 6 (1976 ed.). This is precisely what the Secretary and his assistants were empowered and required to do. That they would on occasion be mistaken in their judgment that a particular merchant had in fact violated the regulations is a necessary concomitant of any known system of administrative adjudication; that they acted "maliciously" gives no support to respondent's claim against them unless we are to overrule *Spalding.*

The Court's attempt to distinguish *Spalding* may be predi-

cated on a simpler but equally erroneous concept of immunity. At one point the Court observes that even under *Spalding* "an executive officer would be vulnerable if he took action 'manifestly or palpably' beyond his authority or ignored a clear limitation on his enforcement powers." *Ante,* at 493 n. 18. From that proposition, which is undeniably accurate, the Court appears to conclude that anytime a plaintiff can paint his grievance in constitutional colors, the official is subject to damages unless he can prove he acted in good faith. After all, Congress would never "authorize" an official to engage in unconstitutional conduct. That this notion in fact underlies the Court's decision is strongly suggested by its discussion of numerous cases which supposedly support its position, but all of which in fact deal not with the question of what level of immunity a federal official may claim when acting within the outer limits of his authority, but rather with the question of whether he was in fact so acting. See *ante,* at 489–491.

Putting to one side the illogic and impracticability of distinguishing between constitutional and common-law claims for purposes of immunity, which will be discussed shortly, this sort of immunity analysis badly misses the mark. It amounts to saying that an official has immunity until someone alleges he has acted unconstitutionally. But that is no immunity at all: The "immunity" disappears at the very moment when it is needed. The critical inquiry in determining whether an official is entitled to claim immunity is not whether someone has in fact been injured by his action; that is part of the plaintiff's case in chief. The immunity defense turns on whether the action was one taken "when engaged in the discharge of duties imposed upon [the official] by law," *Spalding,* 161 U. S., at 498, or in other words, whether the official was acting within the outer bounds of his authority. Only if the immunity inquiry is approached in this manner does it have any meaning. That such a rule may occasionally result in individual injustices has never been doubted, but at least until

today, immunity has been accorded nevertheless. As Judge Learned Hand said in *Gregoire* v. *Biddle,* 177 F. 2d, at 581:

> "The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . ."

Indeed, in that very case Judge Hand laid bare the folly of approaching the question of immunity in the manner suggested today by the Court.

> "The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the

whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. . . ." *Ibid.*

*Barr* v. *Matteo,* 360 U. S. 564 (1959), unfortunately fares little better at the Court's hand than *Spalding.* Here the Court at least recognizes and reaffirms the minimum proposition for which *Barr* stands—that executive officials are absolutely immune at least from actions predicated on common-law claims as long as they are acting within the outer limits of their authority. See *ante,* at 495. *Barr* is distinguished, however, on the ground that it did not involve a violation of "those fundamental principles of fairness embodied in the Constitution." *Ibid.* But if we allow a mere allegation of unconstitutionality, obviously unproved at the time made, to require a Cabinet-level official, charged with the enforcement of the responsibilities to which the complaint pertains, to lay aside his duties and defend such an action on the merits, the defense of official immunity will have been abolished in fact if not in form. The ease with which a constitutional claim may be pleaded in a case such as this, where a violation of statutory or judicial limits on agency action may be readily converted by any legal neophyte into a claim of denial of procedural due process under the Fifth Amendment, will assure that. The fact that the claim fails when put to trial will not prevent the consumption of time, effort, and money on the part of the defendant official in defending his actions on the merits. The result can only be damage to the "interests of the people," *Spalding, supra,* at 498, which "require[s] that due protection be accorded to [Cabinet officials] in respect of their official acts."

It likewise cannot seriously be argued that an official will be less deterred by the threat of liability for unconstitutional

conduct than for activities which might constitute a common-law tort. The fear that inhibits is that of a long, involved lawsuit and a significant money judgment, not the fear of liability for a certain type of claim. Thus, even viewing the question functionally—indeed, *especially* viewing the question functionally—the basis for a distinction between constitutional and common-law torts in this context is open to serious question. Even the logical justification for raising such a novel distinction is far from clear. That the Framers thought some rights sufficiently susceptible of legislative derogation that they should be enshrined in the Constitution does not necessarily indicate that the Framers likewise intended to establish an immutable hierarchy of rights in terms of their importance to individuals. The most heinous common-law tort surely cannot be less important to, or have less of an impact on, the aggrieved individual than a mere technical violation of a constitutional proscription.

The Court purports to find support for this distinction, and therefore this result, in the principles supposedly underlying *Marbury* v. *Madison,* 1 Cranch 137 (1803) and *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), and the fact that cognate state officials are not afforded absolute immunity for actions brought under 42 U. S. C. § 1983. Undoubtedly these rationales have some superficial appeal, but none withstands careful analysis. *Marbury* v. *Madison, supra,* leaves no doubt that the high position of a Government official does not insulate his actions from judicial review. But that case, like numerous others which have followed, involved equitable-type relief by way of mandamus or injunction. In the present case, respondent sought damages in the amount of $32 million. There is undoubtedly force to the argument that injunctive relief, in these cases where a court determines that an official defendant has violated a legal right of the plaintiff, sets the matter right only as to the future. But there is at least as much force to the argument

that the threat of injunctive relief without the possibility of damages in the case of a Cabinet official is a better tailoring of the competing need to vindicate individual rights, on the one hand, and the equally vital need, on the other, that federal officials exercising discretion will be unafraid to take vigorous action to protect the public interest.

The Court also suggests in sweeping terms that the cause of action recognized in *Bivens* would be " 'drained of meaning' if federal officials were entitled to absolute immunity for their constitutional transgressions." *Ante,* at 501. But *Bivens* is a slender reed on which to rely when abrogating official immunity for Cabinet-level officials. In the first place, those officials most susceptible to claims under *Bivens* have historically been given only a qualified immunity. As the Court observed in *Pierson* v. *Ray,* 386 U. S. 547, 555 (1967), "[t]he common law has never granted police officers an absolute and unqualified immunity . . . ." In any event, it certainly does not follow that a grant of absolute immunity to the Secretary and Assistant Secretary of Agriculture requires a like grant to federal law enforcement officials. But even more importantly, on the federal side, when Congress thinks redress of grievances is appropriate, it can and generally does waive sovereign immunity, allowing an action directly against the United States. This allows redress for deprivations of rights, while at the same time limiting the outside influences which might inhibit an official in the free and considered exercise of his official powers. In fact, Congress, making just these sorts of judgments with respect to the very causes of action which the Court suggests require abrogation of absolute immunity, has amended the Federal Tort Claims Act, see 28 U. S. C. § 2680 (h) (1976 ed.), to allow suits against the United States on the basis of certain intentional torts if committed by federal "investigative or law enforcement officers."

The Court also looks to the question of immunity of state officials for causes arising under § 1983 and, quoting a con-

curring opinion in *Anderson* v. *Nosser,* 438 F. 2d 183, 205 (CA5 1971), to the effect that there should not be "one law for Athens and another for Rome," finds no reason why those principles should not likewise apply when federal officers are the target. Homilies cannot replace analysis in this difficult area, however. And even a moment's reflection on the nature of the *Bivens*-type action and the purposes of § 1983, as made abundantly clear in this Court's prior cases, supplies a compelling reason for distinguishing between the two different situations. In the first place, as made clear above, a grant of absolute immunity to high-ranking executive officials on the federal side would not eviscerate the cause of action recognized in *Bivens.* The officials who are the most likely defendants in a *Bivens*-type action have generally been accorded only a qualified immunity. But more importantly, Congress has expressly waived sovereign immunity for this type of suit. This permits a direct action against the Government, while limiting those risks which might "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." And the Federal Government can internally supervise and check its own officers. The Federal Government is not so situated that it can control state officials or strike this same balance, however. Hence the necessity of § 1983 and the differing standards of immunity. As the Court observed in *District of Columbia* v. *Carter,* 409 U. S. 418 (1973):

> "Although there are threads of many thoughts running through the debates on the 1871 Act, it seems clear that § 1 of the Act, with which we are here concerned, was designed primarily in response to unwillingness or inability of the state governments to enforce their own laws against those violating the civil rights of others." *Id.,* at 426.
>
> "[T]he [basic] rationale underlying Congress' decision not to enact legislation similar to § 1983 with respect to

federal officials [was] the assumption that the Federal Government could keep its own officers under control . . . ." *Id.,* at 429–430.

The Court attempts to avoid the force of this argument by suggesting that the statute which vests federal courts with general federal-question jurisdiction is basically the equivalent of § 1983. *Ante,* at 502 n. 30. But that suggestion evinces a basic misunderstanding of the difference between a statute which vests jurisdiction in federal courts, which are, as a constitutional matter, courts of limited jurisdiction, and a statute, or even a constitutional provision, which creates a private right of action. As even the Court's analysis in *Bivens* made clear, a statute giving jurisdiction to federal courts does not, in and of itself, create a right of action. And to date, the Court has not held that the Constitution itself creates a private right of action for damages except when federal law enforcement officials arrest someone and search his premises in violation of the Fourth Amendment. Thus, the Court's attempt to equate § 1983 and 28 U. S. C. § 1331 (1976 ed.) simply fails, and its further observation—that there should be no difference in immunity between state and federal officials—remains subject to serious doubt.

My biggest concern, however, is not with the illogic or impracticality of today's decision, but rather with the potential for disruption of Government that it invites. The steady increase in litigation, much of it directed against governmental officials and virtually all of which could be framed in constitutional terms, cannot escape the notice of even the most casual observer. From 1961 to 1977, the number of cases brought in the federal courts under civil rights statutes increased from 296 to 13,113. See Director of the Administrative Office of the United States Courts Ann. Rep. 189, Table 11 (1977); Ann. Rep. 173, Table 17 (1976). It simply defies logic and common experience to suggest that officials will not have this in the back of their minds when considering

what official course to pursue. It likewise strains credulity to suggest that this threat will only inhibit officials from taking action which they should not take in any event. It is the cases in which the grounds for action are doubtful, or in which the actor is timid, which will be affected by today's decision.

The Court, of course, recognizes this problem and suggests two solutions. First, judges, ever alert to the artful pleader, supposedly will weed out insubstantial claims. *Ante,* at 507. That, I fear, shows more optimism than prescience. Indeed, this very case, unquestionably frivolous in the extreme, belies any hope in that direction. And summary judgment on affidavits and the like is even more inappropriate when the central, and perhaps only, inquiry is the official's state of mind. See C. Wright, Law of Federal Courts 493 (3d ed. 1976) (It "is not feasible to resolve on motion for summary judgment cases involving state of mind"); *Subin* v. *Goldsmith,* 224 F. 2d 753 (CA2 1955).

The second solution offered by the Court is even less satisfactory. The Court holds that in those special circumstances "where it is demonstrated that absolute immunity is essential for the conduct of the public business," absolute immunity will be extended. *Ante,* at 507. But this is a form of "absolute immunity" which in truth exists in name only. If, for example, the Secretary of Agriculture may never know until inquiry by a trial court whether there is a possibility that vexatious constitutional litigation will interfere with his decisionmaking process, the Secretary will obviously think not only twice but thrice about whether to prosecute a litigious commodities merchant who has played fast and loose with the regulations for his own profit. Careful consideration of the rights of every individual subject to his jurisdiction is one thing; a timorous reluctance to prosecute any of such individuals who have a reputation for using litigation as a defense weapon is quite another. Since Cabinet officials are mortal,

it is not likely that we shall get the precise judgmental balance desired in each of them, and it is because of these very human failings that the principles of *Spalding,* 161 U. S., at 498, dictate that absolute immunity be accorded once it be concluded by a court that a high-level executive official was "engaged in the discharge of duties imposed upon [him] by law."*

Today's opinion has shouldered a formidable task insofar as it seeks to justify the rejection of the views of the first Mr. Justice Harlan expressed in his opinion for the Court in *Spalding* v. *Vilas, supra,* and those of the second Mr. Justice Harlan expressed in his opinions in *Barr* v. *Matteo,* 360 U. S. 564 (1959), and its companion case of *Howard* v. *Lyons,* 360 U. S. 593 (1959). In terms of juridical jousting, if not in terms of placement in the judicial hierarchy, it has taken on at least as formidable a task when it disregards the powerful statement of Judge Learned Hand in *Gregoire* v. *Biddle,* 177 F. 2d 579 (CA2 1949).

---

*The ultimate irony of today's decision is that in the area of common-law official immunity, a body of law fashioned and applied by judges, absolute immunity within the federal system is extended only to judges and prosecutors functioning in the judicial system. See *Bradley* v. *Fisher,* 13 Wall. 335 (1872); *Yaselli* v. *Goff,* 12 F. 2d 396 (CA2 1926), summarily aff'd, 275 U. S. 503 (1927). Similarly, where this Court has interpreted 42 U. S. C. § 1983 in the light of common-law doctrines of official immunity, again only judges and prosecutors are accorded absolute immunity. See *Pierson* v. *Ray,* 386 U. S. 547 (1967); *Stump* v. *Sparkman,* 435 U. S. 349 (1978); *Imbler* v. *Pachtman,* 424 U. S. 409 (1976). If one were to hazard an informed guess as to why such a distinction in treatment between judges and prosecutors, on the one hand, and other public officials on the other, obtains, mine would be that those who decide the common law know through personal experience the sort of pressures that might exist for such decisionmakers in the absence of absolute immunity, but may not know or may have forgotten that similar pressures exist in the case of nonjudicial public officials to whom difficult decisions are committed. But the cynical among us might not unreasonably feel that this is simply another unfortunate example of judges treating those who are not part of the judicial machinery as "lesser breeds without the law."

History will surely not condemn the Court for its effort to achieve a more finely ground product from the judicial mill, a product which would both retain the necessary ability of public officials to govern and yet assure redress to those who are the victims of official wrongs. But if such a system of redress for official wrongs was indeed capable of being achieved in practice, it surely would not have been rejected by this Court speaking through the first Mr. Justice Harlan in 1896, by this Court speaking through the second Mr. Justice Harlan in 1959, and by Judge Learned Hand speaking for the Court of Appeals for the Second Circuit in 1948. These judges were not inexperienced neophytes who lacked the vision or the ability to define immunity doctrine to accomplish that result had they thought it possible. Nor were they obsequious toadies in their attitude toward high-ranking officials of coordinate branches of the Federal Government. But they did see with more prescience than the Court does today, that there are inevitable trade-offs in connection with any doctrine of official liability and immunity. They forthrightly accepted the possibility that an occasional failure to redress a claim of official wrongdoing would result from the doctrine of absolute immunity which they espoused, viewing it as a lesser evil than the impairment of the ability of responsible public officials to govern.

But while I believe that history will look approvingly on the motives of the Court in reaching the result it does today, I do not believe that history will be charitable in its judgment of the all but inevitable result of the doctrine espoused by the Court in this case. That doctrine seeks to gain and hold a middle ground which, with all deference, I believe the teachings of those who were at least our equals suggest cannot long be held. That part of the Court's present opinion from which I dissent will, I fear, result in one of two evils, either one of which is markedly worse than the effect of according absolute immunity to the Secretary and the Assistant Secretary in this

case. The first of these evils would be a significant impairment of the ability of responsible public officials to carry out the duties imposed upon them by law. If that evil is to be avoided after today, it can be avoided only by a necessarily unprincipled and erratic judicial "screening" of claims such as those made in this case, an adherence to the form of the law while departing from its substance. Either one of these evils is far worse than the occasional failure to award damages caused by official wrongdoing, frankly and openly justified by the rule of *Spalding* v. *Vilas, Barr* v. *Matteo,* and *Gregoire* v. *Biddle.*