Decided June 12, 1986.

CC JUN 12 P1:29

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
COMMONWEALTH TRIAL COURT

SAIPAN SECRETARIAL/EMPLOYMENT )   CIVIL ACTION NO. 85-105
SERVICES, INC., A Corporation,)
                              )
        Plaintiff,     )
                              )
    vs.                )
                              )
COMMONWEALTH OF THE NORTHERN   )
MARIANA ISLANDS, REXFORD C.   )     SUMMARY JUDGMENT
KOSACK, INDIVIDUALLY AND AS   )
ATTORNEY GENERAL FOR THE     )
COMMONWEALTH OF THE NORTHERN   )
MARIANA ISLANDS,            )
                              )
        Defendants.     )
                              )

    Two separate motions to dismiss or in the alternative, for summary judgment, have been filed against plaintiff's complaint. One is by the Government and the other by Mr. Kosack, the Attorney General at the time of the critical events herein, in his individual capacity. The former is addressed to the first and second causes of action of the Second Amended Complaint and the latter principally attacks the last four causes of action brought against Kosack individually. The motions will be discussed in the order

702

argued at the hearing on June 4, 1986 although it is readily apparent that the issues and legal arguments overlap and effect the other causes of action.

I.   THE GOVERNMENT'S MOTION

A.   FIRST CAUSE OF ACTION - RUNNING A "FOWL" OF PROCUREMENT POLICY.

Plaintiff's first cause of action is a breach of contract claim. The background for the claim commenced when the plaintiff through Ms. Stacy Pounds, its president, was interested in promoting the plan to obtain a $25,000 U.S. Government grant to the Commonwealth Government for the development of an automated records system (also referred to as Phase I in some of the documents). The grant become a reality when a Technical Assistance Memorandum of Understanding was executed between the Department of Interior and the Governor of the Commonwealth (Exhibit A attached to Kosack's declaration). The funding of $25,000 was to pay for the initial development work needed for automating the records of the Judicial Branch and the Department of Public Safety.

Upon receipt of the funding, the Director of Public Safety, Felix B. Cabrera, caused to be published a "Request for Proposals" (Exhibit C attached to the Declaration of Kosack). This document was published in a local newspaper one time and solicited proposals for Phase I of the project. Proposals had to be submitted one week later (October 12, 1984).

As a result of the publication the plaintiff submitted a proposal (Exhibit A attached to plaintiff's Second Amended

703

Complaint) which offered to do the work for $25,000. The plaintiff's response was the only received by Cabrera. On October 15, 1984, Cabrera signed a letter as Director of Public Safety indicating plaintiff's proposal was selected for Phase I of the project and Ms. Pounds was invited to discuss the project "... and set our priorities for its successful completion."

In simple contract law terms, the plaintiff asserts that upon issuing the letter, Cabrera accepted the offer of plaintiff and a contract was formed at that time. (Plaintiff's opposition to the Motion, page 5) Unfortunately, this case is not that simple and due to various reasons, it is concluded that no contract was formed as a result of Director Cabrera's October 15th, 1984 "acceptance."

At the time of the above events, there was in existence a fairly detailed procurement policy of the Government (See, Exhibit "D" attached to defendant Kosack's declaration). This policy designated who had contracting authority, the procedure to be followed, and the signatures necessary, before the Government would be bound by any contract.

Pursuant to the provisions of Part II of the procurement policy, Cabrera could be the contracting officer for contracts only "which relate specifically to programs falling within (his) general area of administration." Such was not the case here as the scope of the contract includes the Judicial Branch. The procurement policy of the Government required that

all contracts in excess of $10,000 be signed by the Governor (Part IV, A.). Additionally, the contract must contain an audit provision (Part IV, C) and certain steps and other signatures were required before the contracting officer and plaintiff were to sign (Part IV). The response of the plaintiff and the letter of Cabrera do not satisfy these requirements.

In a similar case, Hill v Government of the N.M.I., Civil Action 82-0007 (D.C. NMI 1984), the District Court held that though a contract (not just a letter of acceptance to a proposal) was signed by the plaintiff, the Attorney General and the Program & Budget Officer, there was no contract because the Governor refused to sign it. This was concluded even though the regulations governing the hiring of personnel at the time of the signatures were not in effect. However, the Governor had issued a memorandum to the effect that all hirings required his approval. The reasoning of Hill is even more applicable here since detailed procurement standards and guidelines were in effect at the critical time. The Hill court cited National Treasury Employees Union v Reagan, 663 F.2d 239 (D.C. Cir., 1981) for the proposition that in analyzing government contracts, the applicable rules and regulations determine and define the point at which a contract is enforceable. Additionally, parties contracting with the government are charged with knowledge of the law and regulations governing the

705

formation of such contracts. <u>American General Leasing Inc. v United States</u>, 587 F.2d 54 (Ct. CL, 1978).

The Government raises another defense to the first cause of action which also has merit. It is pointed out that a "Request for Proposals" is subject to negotiation after receipt of any response. This is in contrast to an Invitation for Bids which fully sets forth all the parameters of the intended contract. It is clear that not only did Cabrera's letter of October 15, 1984 contemplate negotiation but both the plaintiff and the Government set upon the course of preparing a contract which included terms such as a payment schedule, scope of work, the period of time the services were to be rendered, etc. Indeed, the thrust of all the other causes of action of the plaintiff concern the failure of the defendants to consummate plaintiff's contract with the Government.

It is concluded that no contract was formed and the First Cause of Action must fail.[1]

---

1/
The Government has also claimed there exists "tainted" procurement procedures and a conflict of interest which personally involve Ms. Stacy Pounds. Though these issues are now moot, they deserve some comment. The affidavits, depositions, and file in this matter reveal that the plaintiff did provide the main impetus in acquiring the $25,000 grant from the Government. No authority is cited to say that this disqualified her from performing the work assuming the proper government procurement policies were adhered to. Nor is the court inclined to attribute sinister aims to the plaintiff because she prepared the Request for Proposals, Cabrera's letter, or even paid for the advertisement. The affidavits and depositions exonerate the plaintiff of any taint which may be derived from these procedures.

The various government officials, primarily Cabrera and personnel in the procurement office, requested Pounds to do the preparation of the documents and since the Department of Public

B. SECOND CAUSE OF ACTION - SOVEREIGN IMMUNITY
SHIELDS THE GOLDEN GOOSE.

This cause of action can be summarily disposed of. It is founded on the claimed contract of the first cause of action and asks for damages beca' se of the Government's "... unlawful interference with plaintiff's property rights and denied plaintiff its due process." The action is brought pursuant to 42 U.S.C. § 1983.

---

Safety had no funds, the plaintiff paid for the advertisement in the paper. Certainly it is not doubted that the plaintiff had her own interests in obtaining the contract but under the circumstances shown to the court in this case, her actions and participation are satisfactorily explained.

The Government also wishes the court to accept the conclusion that the plaintiff was an "insider" who knew about the federal grant and it is argued that since her proposal was for the exact amount of the grant, this disqualifies her. The response to this assertion is that this information was open to the public and was not secret nor did it provide the plaintiff with any advantage over other prospective bidders.

Lastly, the Government cites federal procurement regulations (Circular A-102) to assert a conflict of interest defense. The federal regulations apply apparently because the funds are of federal origin. Yet, these regulations do not pertain to the facts of this case. Under paragraph No. 7 "Code of Conduct", the conflict of interest arises when the employee of the government awarding the contract has a financial interest in the company receiving the award. This would apply to Cabrera, the Governor, etc., but not the plaintiff. Succinctly put, the Government has shown no conflict of interest nor does the court perceive any. United States v Mississippi Valley Generating Co., 364 U.S. 550 (1961), cited by the Government is not the case at bar. The offending official in Mississippi Valley was intimately involved with the government as a consultant and a negotiator for the contract The same official was also employed by a financial institutio' that benefitted from the contract.

The purpose of a conflict of interest law or regulation is to protect the public from corrupting influences so that one may obtain a financial advantage at the expense of the public. No such circumstance is evident here even though the plaintiff was a government employee with the personnel office. If she had been awarded the contract for services, she would have ha'. to perform them as an individual or through her separate company.

The Commonwealth Government has sovereign immunity against suits brought under 42 U.S.C. § 1983. <u>Employment Consultants Inc. v O'Connor, et al</u>, CTC Civil Action 84-424. Additionally, since there was no contract, there is no property interest which the plaintiff has been deprived of.

> <u>Baker v McCollan</u>, 443 U.S. 137, 99 S.Ct. 2689 (1979);
>
> <u>Board of Regents v Roth</u>, 408 U.S. 564, 92 S.Ct. 2701 (1972).

The Second Cause of Action will also be dismissed.

## II. ATTORNEY GENERAL KOSACK'S MOTIONS

A. THE MAIN BROUHAHA - IS WHAT IS GOOD FOR THE GOOSE, GOOD FOR THE GANDER?

Kosack claims absolute immunity pursuant to the doctrine announced in <u>Imbler v Pachtman</u>, 424 U.S. 409, 96 S.Ct. 984 (1976) Though <u>Imbler</u> concerned a prosecutor in a criminal matter, the extension of the doctrine of absolute immunity for government attorneys in other types of cases is established. <u>Butz v Economou</u>, 438 U.S. 478, 98 S.Ct. 2894 (1978); <u>Demery v Kuperman</u>, 735 F.2d 1139 (9th Cir. 1984) <u>cert denied</u>, 105 S.Ct. 810.

Principally because of the facts in this case, Kosack relies upon <u>Mother Goose Nursery School v Sendak</u>, 770 F.2d 668 (7th Cir. 1985), <u>cert denied</u>, ___U.S.___ (1986). In <u>Mother Goose</u>, the Attorney General was responsible for reviewing proposed contracts for form and legal sufficiency. He

disapproved plaintiff's contract because of his knowledge that the President and Director of the plaintiff had a criminal conviction while the State of Indiana required the staff of the plaintiff to be of good moral character. The court held that the Attorney General was entitled to absolute immunity.

In this case, the same day that Director Cabrera signed the "acceptance" letter of October 15, 1984, Ms. Pounds prepared a "Contract for Services By Independent Contractor" (See, Exhibit "C" attached to plaintiff's second amended complaint) and Cabrera and Pounds, as president of the plaintiff, signed the agreement. No one else executed the agreement and the plaintiff does not assert that this is a valid contract.[2]

The Independent Contract states: "It is agreed that neither the contractor nor an employee or employees of the contractor are employees of the Northern Marianas Government." At the time Stacy Pounds, President of Saipan Secretarial Services, was employed by the Personnel Office of the Government. When the contract was given to Kosack, he refused

---

2/

This case demonstrates the quirks and inconsistencies that can occur in allowing the pleading of alternate causes of action. If the plaintiff was successful in the 1st cause of action, any actions by the Attorney General which relate to the Independent Contract would be of no moment. The plaintiff would have its breach of contract action pursuant to 7 CMC § 2251(b). Once the conclusion is reached that there was no contract, this gives significance to the refusal to proceed on the second document.

to approve it. There is a dispute as to the reasons why Kosack did not sign off on the document. According to the plaintiff, Kosack told her the U.S. Justice Department would do the work. Plaintiff denies the reasons now given by Kosack for rejecting the agreement were stated to the plaintiff at any time except in response to this suit. Kosack asserts there were several reasons as to why he did not sign the document: (1) failure to comply with CNMI procurement policies and procedures; (2) failure to comply with U.S. procurement standards; (3) the fact that Stacy Pounds was an employee of the Government; (4) waste of public funds; and (5) the request of the Public Auditor to not sign the document.

Though Mother Goose appears analogous to this case, the plaintiff raises two main arguments to its application.

First, the plaintiff points out that 1 CMC § 2153(g) gives the Attorney General the duty to "review and approve, as to form and legal capacity, all proposed contracts ... of the Commonwealth ..." (emphasis added) Thus, it is argued, the Commonwealth's Attorney General does not have the duty or responsibility of reviewing and rejecting a contract for legal sufficiency as did the Attorney General in Mother Goose.

According to the plaintiff, the plain reading of 1 CMC § 2153(g) allows the Attorney General authority to reject a proposed contract only because of form or because a contracting party lacks legal capacity to sign the contract.

710

It is true that the term "legal capacity" means the power to enter into binding contracts absent infancy, lunacy or some other defect. <u>Restatement</u>, 2d, Contracts § 12. Yet, it is concluded that the very nature and existence of the Attorney General, as an attorney and legal advisor to the Governor and the Executive Branch plus the overall scheme of governmental organization dictates against such a narrow reading and interpretation of 1 CMC § 2153(g).

Article III, Section 11 of the Constitution of the Commonwealth states:

> "The governor shall appoint an attorney general with the advice and consent of the senate. The attorney general shall be responsible for providing legal advice to the governor and executive departments, representing the Commonwealth in all legal matters, and prosecuting violations of Commonwealth."

1 CMC § 2153 in pertinent part reads:

"The Attorney General shall have the powers and duties as provided in the Commonwealth Constitution. In addition, the Attorney General shall have the following powers and duties:

> . . .

> (g) To review and approve, as to form and legal capacity, all proposed contracts, bonds, or other evidence of contractual obligation of the Commonwealth, its departments, agencies and instrumentalities, including public corporations;

> (h) To act, upon request, as counsel to all departments agencies, and instrumentalities of the Commonwealth, including public corporations except the Marianas Public Land Corporation and the Marianas Public Land Trust. Subject to budgetary appropriation, separate legal counsel may be retained for particular matters."

With this broad range of duties and responsibilities, the Attorney General has just as much authority over the approval or rejection of government contracts as the Attorney General in Indiana. So, in this respect, Mother Goose is not distinguishable. It is concluded that in reviewing and rejecting the proposed contract of the plaintiff, the Attorney General was acting within his constitutional and statutory scope of authority.

Second, the plaintiff argues that even if Kosack had the responsibility, to accept or reject the contract, he did so in this case beyond the scope of his lawful authority. In short, plaintiff asserts that Kosack now fabricates the reasons for rejecting plaintiff's contract and that he arbitrarily considered the contract a "bad" one and under such circumstances he does not enjoy immunity. Citing, Three Rivers Cablevision, Inc. v City of Pittsburgh, 502 F.Supp. 1118 (D.C. PA. 1980), the plaintiff argues that the government cannot arbitrarily decline to accept plaintiff's contract as this deprives the bidder of a substantive benefit without due process of law.

However, once the Attorney General acts within the scope of his authority in rejecting the contract, the asserted deprivation of due process will not carry the day in so far as erasing the Attorney General's immunity is concerned. Ybarra v Reno Thunderbird Mobile Home Valley, 723 F.2d 675 (9th Cir. 1984). As the court in Ybarra observed, if a plaintiff

712

can simply allege a violation of due process to avoid immunity, the entire doctrine of immunity would be abrogated. The Ybarra court adopted the test announced in Briggs v Goodwin, 569 F.2d 10, 15-16 (D.C. Cir. 1977) cert denied, 437 U.S. 904, 98 S.Ct. 3089 (1978) which, succinctly stated, is to determine not whether the government official performs an act "'manifestly or palpably beyond his authority [but rather] having more or less connection with the general matters committed to his control or supervision.'" Id (quoting, Spalding v Vilas, 161 U.S. 483 (1896).)

In determining whether a government official is entitled to immunity, the three factors enunciated in Butz v Economou, supra, are considered. First, there must be an examination of the historical or common law basis for the immunity in question. Second, whether the function engaged in subjects the official to the same obvious risks of entanglement in vexatious litigation as is characteristic of the judicial process. Third, whether the official is subject to checks upon abuses of authority.

As found by the court in Mother Goose, there is no case law discussing the historical or common law basis when examining the nature of an Attorney General's function in reviewing contracts to which the government is a party. The court recognized that "the Indiana Attorney General received his powers and duties from statutes alone and holds no common law

powers." 770 F.2d at 622 (citation omitted). The court concluded that "'any historical analyses must draw its evidence from our constitutional heritage and structure.'" Id. (quoting Nixon v. Fitzgerald, 457 U.S. 731, 738 (1982).

When the function of the Attorney General as a contract reviewer is compared to a prosecutor and administrator of the criminal laws, the similarities between the two functions are "sufficient to make them analogous for immunity purposes." Mother Goose, supra, at 673.[3]

The Attorney General of the Commonwealth derives his power and authority from the Constitution and statutes. He is the legal advisor for the Executive Branch. As such, he has the responsibility to review contracts and the analogy drawn in Mother Goose is applicable to him.

The second Butz factor, the risk of vexatious litigation, is of special concern. In this case, through discovery and affidavits, it is revealed that the Attorney General must review and approve (or disapprove) over 1,000 contracts a year. The possibility of intimidation and harassment through the filing of lawsuits by disappointed bidders or rejected

---

3/
Recently, the 7th Circuit Court of Appeals had the opportunity to review Mother Goose and found it to be useful in supporting absolute immunity for a criminal prosecutor when she gave advise to the sheriff who jailed the plaintiff wrongfully. Likening the giving of advice to a quasi-judicial function, the court held the prosecutor is entitled to absolute immunity. Henderson v Lopez, 39 Cr.L. 2171 (CA7, 5/5/86)

potential contracting parties is ever present. Without the protection of absolute immunity for the advice which the Attorney General must give, the Attorney General's impartiality would be significantly diminished by the fear of vexatious litigation by those adversely affected by the Attorney General's actions.

Lastly, there are checks upon abuses of authority by the Attorney General. If certain procedures are followed and signatures are acquired on a contract, notwithstanding the Attorney General's advice, a contract action is available against the Government. 7 CMC § 2251(b). If such is not the case, a suit for declaratory or injunctive relief is available. Finally, if the Attorney General fails to act within the scope of his constitutional or statutory duties, he is subject to removal by the Governor.

The crux of plaintiff's suit against Kosack is because he advised against the proposed contract. He knew the plaintiff's president was an employee of the government and the contract provision, quoted above, was not consistent with the status of the plaintiff. This alone gives the government the right to reject the contract but even when the Attorney General failed to approve the contract, the Governor could have overridden that decision and ignored the advice of his legal advisor. If the Governor signed the agreement, it would have been then that a contract came into existence. Hill v Government, supra.

Part V 3. Procurement Policy dated 9/14/84. When placed in this context, two things become apparent.

First, the plaintiff's action against the Attorney General is founded on legal advice he is rendering to the Governor and the Governor has discretion in signing or not signing the contract. Second, the plaintiff does not have a protected property interest to establish its § 1983 action.[4] In order to maintain an action under § 1983, the plaintiff must show that the Attorney General deprived it of a property interest or a right secured by the constitution and laws of the United States. Baker v McCollan, supra. Board of Regents v Roth, supra. The plaintiff had no such property interest and therefore its § 1983 action could not be maintained in any event.

It is concluded that Attorney General Kosack is entitled to and enjoys absolute immunity in reviewing, approving, or disapproving contracts submitted to him and this immunity bars any actions brought against him in his individual capacity by the plaintiff.

---

4/
Disappointed bidders do not have standing to sue under 42 U.S.C. § 1983 when the government retains discretion in awarding a contract. Sowell's Meats on Services, Inc. v McSwain, 788 F.2d 226 (4th Cir. 1986)

B.   THE REMAINING CAUSES OF ACTION - DEAD DUCKS.

The remaining causes of action alleged by the plaintiff must therefore necessarily fail because of Kosack's immunity. It is also noted that the Fourth Cause of Action alleges the wrongful interference with the performance of plaintiff's contract. Since no contract was ever formed, there is no basis for this claim. The Fifth Cause of Action alleges a cause for punitive damages based on the same acts of Kosack. The Sixth Cause of Action alleges that "Kosack wrongfully interfered with plaintiff's prospective advantage of contract..." None of these causes of action allege a viable claim against defendant Kosack.

Summary judgment is hereby entered in favor of all defendants against the plaintiff and this matter shall be and is hereby dismissed.

Dated at Saipan, CM, this 12th day of June, 1986.

Robert A. Hefner, Chief Judge