**STRATFORD NURSING AND CONVALESCENT CENTER, INC. a New Jersey Corporation, Plaintiff,**

**v.**

**Saul KILSTEIN, in his capacity as Director of Division of Medical Assistance and Health Services of the New Jersey Department of Human Services, Thomas Russo, individually and as the director of the Division of Medical Assistance and Health Services of the New Jersey Department of Human Services and Melissa Hager, individually and as agent of the Division of Medical Assistance and Health Services of New Jersey Department of Human Services, Defendants.**

**Civ. No. 88–359.**

United States District Court, D. New Jersey.

Nov. 15, 1991.

---

Marvin Neiman, Elizabeth, NJ, for plaintiff.

Robert J. Del Tufo, Atty. Gen. of New Jersey, Trenton, NJ, for defendants; Benjamin Clarke, Deputy Atty. Gen., of coun-

sel, Edward Devine, Deputy Atty. Gen., on brief, Trenton, NJ.

## OPINION

DEBEVOISE, District Judge.

This matter comes before the court on Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 59 on all counts of Plaintiff's complaint. In addition, Plaintiff cross-moves for summary judgment on all counts of its Complaint. For the reasons set forth below, Defendants' motion will be granted and the complaint will be dismissed.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff, Stratford Nursing and Convalescent Center is a licensed nursing home that has participated in the New Jersey Medicaid program since the inception of that program in 1970. Defendant, Thomas Russo is the former Director of the Division of Medical Assistance and Health Services ("DMAHS"), which is the agency of the State that administers its Medicaid program. Defendant Russo served as Director of DMAHS from 1978 to 1989, when he resigned and was succeeded by Defendant, Saul Kilstein. Defendant Melissa Hager is a Deputy Attorney General ("DAG") employed by the New Jersey Division of Law. She joined the Division of Law in December 1983 and was thereafter assigned to represent DMAHS. She provided legal representation for DMAHS until September 1988, when she was transferred to a new assignment.

### New Jersey's Medicaid Rate–Setting Procedures

Medicaid is a federally-created, state-implemented program designed to ensure that people who cannot afford necessary medical care are able to obtain it, see 42 U.S.C. § 1396 et seq. The program is jointly fund-ed by the state and federal governments, and has been described as an exercise in "cooperative federalism." *Harris v. McRae,* 448 U.S. 297, 308, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980). States have broad discretion under federal statutes to adopt their own standards for determining the extent of medical assistance to be provided, but to qualify for federal funds, participating states must submit a state plan to the federal Department of Health and Human Services for approval. 42 U.S.C. § 1396a(a); 42 C.F.R. § 430.10. Among other things, the state plan must "provide for the establishment or designation of a single state agency to administer or supervise the administration of the plan." 42 U.S.C. § 1396a(a)(5). DMAHS is the designated "single state agency" vested with authority to "determine the amounts to be paid medical providers" under Medicaid. *N.J.S.A.* 30:4D–5; 30:4D–7(b).

Under DMAHS's regulations, long-term care facilities like Stratford that provide care to Medicaid-eligible patients are reimbursed on the basis of rates established annually for each participating facility. *N.J.A.C.* 10:63–3.1(A). DMAHS does not itself perform the initial calculation of a facility's reimbursement rate, but rather has contracted with the Health Facilities Rate–Setting ("HFRS") Unit of the New Jersey Department of Health (the agency of the state that is generally responsible for hospital rate-making under New Jersey's health care statutes, see *N.J.S.A.* 26:2H–1 et seq.) to perform that initial calculation. For each participating facility, HFRS calculates an annual rate from financial information filed by the facility,[1] and then forwards its calculation to DMAHS for review and approval.

After being notified of its annual rate, a facility has 30 days to decide if it wishes to appeal. *N.J.A.C.* 10:63–3.20(a)(1). If it chooses to appeal, the first step in the process is to request a "Level I" review,

---

1. Under the current "prospective rate-setting" system, rate years coincide with the facility's fiscal year (usually July 1 to June 30). The rates reflect cost data from the previous calendar year. *e.g.* the rate effective July 1, 1991 would be based on data from the period January 1, 1990 to December 31, 1990. *see In re* *Medicaid Long Term Care Services Bulletin,* 212 N.J.Super 48, 52–53, 513 A.2d 967 (App.Div.), *certif. den.,* 107 N.J. 31, 526 A.2d 125 (1986). The phrase "rate year 1991" as used in this opinion, denotes the rate year commencing July 1, 1991 and ending June 30, 1992.

which may be accomplished by an informal hearing or by document submission. After the facility has presented any evidence or arguments it wishes to present regarding the rate determination, a Level I decision, which must be approved by both the Director of HFRS and DMAHS's Chief of Long Term Care Reimbursement, is issued to the facility. *See e.g.* Defendants' Brief, Appendix ("App.") Volume II ("Vol. II"), Exhibit ("Exh.") 26.

If the facility is not satisfied with the Level I decision, it may, within 20 days of receiving that decision, request a more formal hearing, known as a "Level II" appeal. *N.J.A.C.* 10:63–3.20(A)(2). Level II appeals are referred by DMAHS to the New Jersey Office of Administrative Law for formal hearing before an Administrative Law Judge ("ALJ") under New Jersey's Administrative Procedure Act. *N.J.S.A.* 52:14B–1 *et seq.* After a full adversarial trial, the ALJ issues an Initial Decision recommending a disposition of the dispute to DMAHS. The Initial Decision is then reviewed by the Director of DMAHS, who has 45 days to accept or reject the ALJ's recommendations, and to issue a Final Agency Decision. *N.J.S.A.* 52:14B–10(c). If a facility is still not satisfied with its reimbursement rate, it may appeal that decision to the Superior Court of New Jersey, Appellate Division. N.J.Ct.R. 2:2–3(a)(2). Review of any Appellate Division decision would be in the Supreme Court of New Jersey. N.J.Ct.R. 2:2–1(a)(2); N.J.Ct.R. 2:12–1.

*Rate–Setting Methodology and Property Cost Reimbursement*

Effective December 29, 1977, DMAHS promulgated regulations, known as "Cost Accounting and Rate Evaluation" ("CARE") guidelines, describing "the methodology to be used by the State of New Jersey to establish prospective per diem rates for the providing of routine care to patients under the State's Medicaid program." Foreward, *N.J.A.C.* 10:63–3.1. In general terms, the CARE regulations pro-

vide for reimbursement of facilities based on a "screened rate" system, under which rates are calculated by applying regulatory "screens," or reasonableness limits, to the actual costs reported by the facility for each of the twelve "cost centers" (e.g., food, patient care, property). As to each cost center, a facility will generally be reimbursed for actual costs up to the screened limit, which, for most cost centers, is determined by a statewide averaging process.

In the area of property costs, however, the regulatory "screen" used to limit a facility's reimbursement rate is somewhat different. Rather than a statewide-average type of screen, DMAHS uses a facility-specific screen known as a Capital Facilities Allowance ("CFA") to set the limit to property costs.[2] Before January 1986, the property cost component of a facility's rate was calculated by using either its actual property costs or its "screened," CFA-derived limit, whichever was lower. Effective January 21, 1986, DMAHS amended its CARE guidelines to make the CFA method of calculating a facility's property cost reimbursement the sole method of reimbursement. *see* 17 N.J.Reg. 2331 (Oct. 7, 1985).

While the CARE guidelines specify the standard rate-setting methodology for determining reimbursement rates for nursing homes, the guidelines also recognize, as federal law does, the need for some discretion in order to address exceptional situations in which "the strict application of the CARE regulations might result in some inequity." *see* Foreward, *N.J.A.C.* 10:63–3.1; 42 C.F.R. 430.10 *et seq.* In some instances, the guidelines expressly incorporate a waiver mechanism that allows for relaxation of the regulatory screen. One example of such a waiver mechanism is *N.J.A.C.* 10:63–3.10(m)(2), the now-repealed provision upon which the dispute of the parties in this matter rests. That provision allowed facilities that were subject to "firm arms-length leases whose terms cannot be modified" to seek to have their property cost reimbursement calculated on the basis

---

**2.** A facility's CFA is based mainly on its 1977 appraised value rather than cost experience.

*see N.J.A.C.* 10:63–3.10(a).

of their actual lease costs instead of their CFA equivalent. In the parlance that developed around this provision, a facility seeking to have its property costs calculated on an actual cost basis rather than by application of its CFA was said to be seeking a "lease pass-through." The "pass-through" regulation provided in full:

> The departments [i.e., DMAHS and HFRS] will review, on an individual basis, situations where the strict application of the provisions of this section would be inappropriate under particular circumstances, such as:
> 1. Situations where an existing debt must be refinanced in connection with obtaining funds to expand existing LTCF's;
> 2. The existence of a firm arms-length lease whose terms cannot be modified;
> 3. The inability of LTCF's to obtain 25–year financing.

As noted above, the lease pass-through provision was deleted from the CARE regulations in January of 1986. 18 N.J.Reg. 189(a) (Jan. 21, 1986). .

In addition to the lease pass through relief, the DMAHS has traditionally afforded and continues to provide facilities relief from strict application of the CARE guidelines via "hardship relief." Hardship relief is a form of relief granted on a case-by-case basis to economically distressed facilities with extremely high percentages of Medicaid patients in their resident population (i.e. percentages in excess of 80%). Defendants' Brief at 9. Where DMAHS has granted a facility hardship status, additional reimbursement may be provided in the form of a waiver of the screen for a particular cost center, or by means of an increase in the facility's overall rate. *Id.*

Plaintiff, in 1972–73 was granted hardship status by DMAHS. In Plaintiff's case the relief took the form of a two and one-half percent increase in its total per diem rates. *Id.*

### History of the Dispute Between the Parties

Plaintiff does not own the land upon which its facility is located or the buildings that house it, but rather operates under a long-term lease. As initially executed in January of 1969, the lease had a termination date of December 31, 1990. See Defendants' Brief, App., Vol. I, Exh. 5. Defendants contend that the Plaintiff's lease has been modified at lease twice since its initial execution. First, on December 31, 1969, Defendants assert that it was modified to grant Plaintiff's lessor a 33% phased rent increase. *Id.*, Exh. 6. Finally, on March 30, 1982, Defendants assert that the lease was further modified to extend its term through December 2010, again at an increased rental rate.

For the rate years, 1978, 1979 and 1980, Plaintiff sought a lease pass-through from DMAHS under *N.J.A.C.* 10:63–3.10(m)(2). For each of those rate years, DMAHS denied Stratford's requests. *Id.*, Exh. 8. Defendants maintain that Plaintiff's request was denied because DMAHS interpreted and implemented *N.J.A.C.* 10:63–3.10(m)(2) (the lease pass-through provision) so that a pass-through would only be granted where the facility's property cost reimbursement under the CARE regulations was lower than the property cost reimbursement they received under the rate-setting system that preceded CARE. DMAHS, in other words, viewed the pass-through provision of *N.J.A.C.* 10:63–3.10(m)(2) as a relief-valve for its CARE guidelines. If the facility was "doing worse" with respect to property cost reimbursement under its CARE guidelines, it would be entitled to consideration for a lease pass-through for that year. *Id.* Exh.

On September 3, 1981, Stratford filed a Level II appeal from DMAHS's denial of its requests for lease pass-throughs for the 1978, 1979 and 1980 rate periods. *Id.* Exh. 10. Following an administrative hearing, the ALJ, Honorable Bernard Goldberg, recommended that the DMAHS grant Plaintiff a pass-through for the years in question, based principally on the fact that Plaintiff's actual lease costs exceeded its CFA. *Id.* Exh. 11. Judge Goldberg's decision was then forwarded to DMAHS Director, Defendant Thomas Russo, for his approval or disapproval. Russo, noting that Judge

Goldberg's decision did not address or take into account DMAHS's policy of applying *N.J.A.C.* 10:63–3.10(m)(2) only to facilities whose post-CARE reimbursement rate was lower than their pre-CARE rate, remanded the matter to the ALJ for additional findings and recommendations on that issue. *Id.*, Exh. 12.

On remand, Plaintiff contended that DMAHS's restrictive interpretation of the pass-through regulation amounted to unauthorized "rulemaking," in violation of the Administrative Procedure Act. Judge Goldberg agreed with this contention and, on June 4, 1985, affirmed his previous recommendation that Plaintiff be granted a pass-through for each of the rate years in question. *Id.* Exh. 13. Russo, on review of Judge Goldberg's recommendations, disagreed with them, and concluded, in a Final Agency Decision, dated July 12, 1985 that, under DMAHS's standing interpretation of *N.J.A.C.* 10:63–3.10(m)(2), Plaintiff was not entitled to a pass-through. *Id.* Exh. 14. Plaintiff then appealed this decision to the Appellate Division.

In its decision dated November 30, 1986 the Appellate Division reversed Russo's decision and held that DMAH's interpretation of *N.J.A.C.* 10:63–3.10(m)(2) was of no effect since it had not been formally promulgated as a regulation. *Stratford v. DMAHS*, 215 N.J.Super. 479, 483, 522 A.2d 442 (App.Div.1986); *see* Defendant's Brief, App.Vol. I, Exh. 1. The Appellate Division remanded the matter back to DMAHS, whereupon Russo directed his staff to augment Plaintiff's rates for 1978, 1979 and 1980 to provide for a pass-through for those years.

During the time that Plaintiff's rate appeal for years 1978, 1979 and 1980 was progressing through the administrative and appellate process, DMAHS determined Plaintiff's rates for the rate years, 1981, 1982, 1983, 1984 and 1985. In each of those rate years, the property cost component of Plaintiff's rate was based upon its CFA, not on its actual lease costs.

Plaintiff contended that, as a result of the Appellate Division's decision, it was entitled to receive a pass-through for each of the intervening rate years. DMAHS did not share this view. Plaintiff, therefore, applied to the Appellate Division for post-decision relief. By notice of motion dated March 10, 1987, Plaintiff sought an order "in aid of litigant's rights" compelling DMAHS to recalculate Plaintiff's rates on a pass-through basis for each of the rate years from 1981 through 1986. Defendants' Brief, App., Vol. I, Exh. 15. DMAHS, contending that those years had not been before the Appellate Division and that Plaintiff's entitlement to a pass-through for those years had never been established, opposed the motion. By order dated March 31, 1987, the Appellate Division denied Plaintiff's motion "without prejudice to renewal after 20 days." *Id.* Exh. 16. Several months later, Plaintiff filed a second motion seeking the same relief it had sought in the previous motion. *Id.*, Exh. 17. The Appellate Division denied Plaintiff's motion with prejudice. *Id.*, Exh. 18.

Defendants reveal that, despite the Appellate Division's denial of Plaintiff's motion, DMAHS nevertheless undertook to assess the intervening rate years. This review revealed that, for rate years, 1981 and 1982, Plaintiff did not exercise its right to pursue a Level II appeal from its rate determination. Defendants contend that Plaintiff was informed of its right to appeal this determination within 20 days in order to effectively contest its rate. *Id.*, Exh. 19.

For the rate year 1983, Plaintiff also failed to pursue a Level II appeal, but for that year the Level I decision specifically noted with respect to the pass-through issue:

This same issue for prior rate periods, was appealed to the administrative law judge level (OAL Dkt. No. HMA 07456–81) ... Should the final agency decision from this appeal be in the home's favor, we would adjust the facility's July 1, 1983 rate accordingly. *Id.*, Exh. 20.

For the rate year 1984, the Level I decision contained no representation that a later adjustment would be made to allow for a pass-through if Stratford prevailed on its

appeal for the 1978–80 rate years. Rather, Defendants maintain that the Level I decision for 1984 contained standard language advising Stratford that it had 20 days in which to file for an appeal if it disagreed with the decision. Defendants' Brief, App., Vol. II, Exh. 21. Plaintiff submitted a timely request for a Level II hearing for its 1984 rate. *Id.,* Exh. 22. Shortly after receiving Plaintiff's request, however, HFRS Director Charles Buttacci wrote Plaintiff a letter in which he stated that a proviso like the one included in the 1983 Level I decision (i.e. stating that the rate for that year would be adjusted if Plaintiff prevailed in the 1978–80 appeal) "should have been incorporated in [the] Level I decision with respect to the . . . 1984 rates." *Id.,* Exh. 23.

Plaintiff's request for a Level II hearing with respect to its 1984 rate was nonetheless forwarded by DMAHS in the normal course to the office of Administrative Law as a formal adversarial proceeding. Also, in accordance with normal procedure, the Attorney General's office assigned a Deputy Attorney General to represent DMAHS in the OAL proceedings. The DAG assigned was Defendant Hager, who was already handling Plaintiff's appeal of its rates for rate years 1978 to 1980. Shortly thereafter, Plaintiff withdrew its Level II appeal for the rate year 1984. *Id.,* Exh. 25.

With respect to rate year 1985, Plaintiff did not seek a Level II appeal, but as with the Level I decision for rate year 1983, the Level I decision for 1985 expressly stated that Plaintiff's rates would be adjusted to provide for a pass-through if Plaintiff prevailed in its appeal with respect to rate years 1978–1980. *Id.,* Exh. 26.

In light of the above procedural history, DMAHS concluded that Plaintiff was not entitled to retroactive rate adjustment for the rate years 1981 and 1982 because Plaintiff failed to preserve its right to contest those rate years by filing a Level II appeal. *Id.,* Exh. 27. Similarly, with respect to 1984, DMAHS determined that no adjust-

ment should be made in light of Plaintiff's withdrawal of its Level II appeal. With respect to rate years 1983 and 1985, however, DMAHS agreed to grant Plaintiff a lease pass-through because, in the Level I decisions for those years it had represented that it would re-calculate the rate if Plaintiff prevailed on its 1978–1980 appeal. As to the 1985 rate year, however, DMAH's contended that its promise to adjust the rate was restricted to the first half of the rate year, since, as noted above, the lease pass-through provision was repealed in January of 1986.

In January of 1988, Plaintiff filed its first Complaint in this matter, naming as defendants, Commissioner and Chief Executive Officer of the New Jersey Department of Human Services, Drew Altman (in his official capacity), DMAHS Director Russo (individually and in his official capacity) and DAG Hager (individually and in her official capacity).

During the pendency of this suit, Plaintiff filed Level II appeals for the rate years 1987, 1988 and 1989. *Id.* At Plaintiff's request, no hearings have been held on those appeals.

In September of 1989, Defendants moved, before Judge Rodriguez to dismiss the Plaintiff's complaint pursuant to Fed. R.Civ.P. 12(b)(6). Defendants' motion was denied in part and granted in part. Judge Rodriguez dismissed Plaintiff's suit against Altman and concluded that, as against the state, Plaintiff could only recover prospective injunctive relief.

In April of 1991, Plaintiff filed an Amended Complaint, naming Saul Kilstein, present Director of DMAHS as a Defendant in his official capacity. Plaintiff has alleged four causes of action. First Plaintiff alleges that Defendants' failure to pay Plaintiff its "correct Medicaid rate" constitutes an unlawful deprivation of Plaintiff's rights under 42 U.S.C. § 1983.[3] In the second cause of action Plaintiff alleges that Defendants' continued refusal to give Plaintiff its "correct Medicaid rate" consti-

---

**3.** This claim stems from DMAHS's refusal to grant a lease pass-through for the rate years 1978, 1979 and 1980.

tutes an unlawful deprivation of its civil rights under 42 U.S.C. § 1983.[4] The third cause of action is for legal fees, pursuant to 42 U.S.C. § 1988, resulting from the Appellate Division proceeding entitled *Stratford v. DMAHS,* 215 N.J.Super. 479, 522 A.2d 442 (App.Div.1986). The Plaintiff's fourth cause of action asserts that Defendants' refusal to grant it a lease pass-through is a violation of its right to equal protection under the federal and state constitution.

For organizational purposes, I will address Plaintiff's claims in four subdivisions: (i) Plaintiff's right to prospective declaratory relief; (ii) Plaintiff's civil rights claims against Russo and Hager, individually; (iii) Plaintiff's claim for attorney's fees pursuant to § 1988; and (iv) Plaintiff's equal protection claim.

## DISCUSSION

### *Summary Judgment*

Summary judgment must be granted where the moving party establishes that "there is no genuine issue as to any material fact and that ... [it] is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Once the moving party has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *rev'g* 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *First National Bank v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968), *reh'g denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.,* 533 F.2d 96,

99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

The Supreme Court has explained that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. A disputed factual matter is a "genuine" issue if "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Furthermore, all evidence must be viewed in a light most favorable to the nonmoving party. *Wahl v. Rexnord, Inc.,* 624 F.2d 1169, 1181 (3d Cir.1980).

### I. *Plaintiff's Right to Prospective Relief*

■ In addition to claiming entitlement to lease pass-through relief for the years 1981 through 1986, plaintiff argues that it is entitled to such hardship relief for all subsequent rate periods after 1986. Essentially, Plaintiff seeks an open-ended, perpetual lease pass-through for its reimbursement rate. To support its contention, plaintiff asserts that the Appellate Division in *Stratford v. DMAHS* intended that its finding should be applied prospectively, to all future rate years.

Clearly the Appellate Division did not intend such a result. In fact, in his opinion, Judge Furman specifically concluded as follows; "We reverse and remand with directions to DMAHS to adopt the ALJ's recommendation in his decisions of May 29, 1984 and June 4, 1985." *Stratford,* 215 N.J.Super. at 484, 522 A.2d 442. In the ALJ decisions referred to by Judge Furman, the ALJ expressly stated that his findings were confined to the rate years 1978–1980; "The rate periods at issue in this matter commenced January 1, 1978; July 1, 1978; July 1, 1979 and July 1, 1980." *Stratford v. DMAHS,* OAL Dkt. No HMA 6084 (June 4, 1985) (annexed to Defendants' Brief, App., Vol. I, Exh. 13).

Thus, Plaintiff is not entitled to prospective application of the findings of the Ap-

---

**4.** This cause of action relates to DMAH's refusal to grant Plaintiff a lease pass-through for the rate years 1981, 1982 and 1984; as well as all the rate years beginning in 1986 and continuing through the present and into the future.

pellate Division. Plaintiff is only entitled to retroactive reimbursement for the rate years which were expressly addressed in the scope of the Appellate Division's ruling. Since those years have already been recalculated, no further relief is warranted.

In further support of its petition for prospective relief, Plaintiff asserts that the DMAHS's long standing policy of applying appellate decisions to future years, entitles it to hardship relief for all rate years subsequent to the Appellate Division decision. This reasoning is inconsistent with the DMAHS rate setting procedure codified in *N.J.A.C.* 10:63–3 *et seq.* The CARE rate-setting methodology is predicated on *annual*, case-by-case review of the financial circumstances of each nursing home participating in the program. *N.J.S.A.* 30:4D–1 *et seq.; N.J.A.C.* 10:63:3–1. In conjunction with this annual review system, DMAHS has promulgated regulations imposing time limits on appeals from rate determinations. *N.J.A.C.* 10:63–3.20. Pursuant to the regulatory appeals process, a facility must pursue a Level I appeal followed by a Level II appeal. Once it has exhausted its right to an appeal before the OAL, a facility may seek review of the prior findings before the New Jersey Appellate Division. Ultimately, the Supreme Court of New Jersey, should it decide to grant certification, will decide whether the DMAHS decision should be reversed.

Thus, to the extent that Plaintiff believed it was entitled to hardship rate relief for any of the rate years after 1986, it should have sought relief by way of a Level I appeal within 30 days after it was notified of its annual rate. Indeed, it appears as though Plaintiff has preserved its right to appeal in the state courts since it filed Level II appeals for the rate years 1987, 1988 and 1989.[5]

In order to dispute the rate calculated for any future rate years, Plaintiff must submit a timely appeal as provided by the Code. The administrative appeals process, established by DMAHS, provides ample op-portunity for Plaintiff to challenge the DMAHS reimbursement rate. Indeed, the Appellate Division ruling in *Stratford v. DMAHS* proves that the administrative appeals process works.

## II. *§ 1983 Civil Rights Claims*

 Plaintiff alleges that Russo and Hager deprived it of its constitutional right, under the Fourteenth Amendment, to a hardship reimbursement rate by refusing to grant Plaintiff a lease pass-through prior to the Appellate Division ruling. Plaintiff further alleges that Russo and Hager violated its Civil Rights under § 1983 when they decided to limit the application of the Appellate Division ruling to the specific years encompassed in the court's decision. I conclude that the Plaintiff's Civil Rights claim must be dismissed since Russo's and Hager's actions were reasonable and protected by the cloak of immunity.

 With respect to Russo, who issued the Final Agency Decision which was overturned by the Appellate Division, it is clear as a matter of law that, he was exercising a quasi-judicial function. *see N.J.A.C.* 1:1–18.6, and is thus entitled to judicial immunity. Moreover, his decision, based as it was on DMAHS's standing interpretation of the pass-through provision, was objectively reasonable and was not contrary to clearly established law. *see Butz v. Economou,* 438 U.S. 478, 514, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978) (administrative agency officials exercising quasi-judicial functions are clothed with judicial immunity).

Moreover, the reversal of the DMAHS interpretation on appeal did not render Russo's conduct objectively unreasonable or in violation of any of Plaintiff's rights and did not deprive Russo of judicial immunity.

Defendant Hager had no involvement in DMAHS's decision to deny Plaintiff's request for a lease pass-through with respect to rate years 1978–80.

Plaintiff further alleges that Defendants Russo and Hager violated its Civil Rights

---

**5.** I make no findings regarding Plaintiff's right to seek appellate review of its rate for the years 1987, 1988, 1989 or any subsequent years.

by refusing to implement the Appellate Division decision in *Stratford v. DMAHS* in the rate years subsequent to 1980.

Under the doctrine of qualified immunity "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate any clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2737–38, 73 L.Ed.2d 396 (1981).

With respect to the rate years 1981 and 1982, (when Plaintiff failed to preserve its right to appeal as provided by *N.J.A.C.* 10:63–3.2 *et seq.*), Plaintiff cannot claim that Defendants acted unreasonably since a plain reading of the code reveals that a facility is only entitled to review of its annual rate where it complies with the administrative appeals process.

Furthermore, as noted above, the Appellate Division ruling did not explicitly or implicitly provide that Plaintiff was entitled to a lease pass-through or other hardship relief for any rate year subsequent to 1980. Thus, a reasonable interpretation of this opinion would not mandate Russo or Hager to adjust any rates except the 1978, 1979 and 1980 years.

Therefore, when Defendants refused to implement the Appellate Division ruling with respect to the rate years 1981 and 1982, they did not violate any clearly established statutory or constitutional rights since (1) Plaintiff failed to preserve its rights; and (2) the Appellate Division decision did not create a constitutional right to have the lease pass-through right applied prospectively.

For the rate year 1984, Plaintiff filed a timely Level II appeal. Shortly after receiving Plaintiff's request for a Level II appeal, HFRS Director Charles Buttacci wrote Plaintiff a letter in which he stated that a proviso like the one included in the 1983 Level I decision (i.e., stating that the rate for that year would be adjusted if Plaintiff prevailed in the 1978–80 appeal) "should have been incorporated in [the]

Level I decision with respect to the ... 1984 rates." Defendants' Brief, App., Vol. II, Exh. 23.

Plaintiff voluntarily withdrew its Level II appeal, with the knowledge that withdrawal at that point would prejudice its right to further administrative appeal. Again, in light of Plaintiff's failure to comply with the administrative appeals process, Russo and Hager's actions were objectively reasonable.

In sum, with respect to the closed rate years (1981, 1982 and 1984) Defendants acted reasonably by refusing to grant retroactive reimbursement for those years. *see Golden Five, Inc. v. Nebraska Department of Social Services,* 229 Neb. 148, 425 N.W.2d 865 (1988) (Medicaid provider which failed to file an administrative appeal was precluded from obtaining retroactive adjustment for that rate year); *Matter of Emmanuel Nursing Home,* 411 N.W.2d 511, 516 (Minn.App.1987) (holding that a nursing home whose rates were calculated under a "rule not properly promulgated under the Administrative Procedure Act" was not entitled to have rated recalculated where it failed to file a timely appeal of the rate decision).

For the rate year 1985, Plaintiff was assured by the DMAHS that there was no need to file a Level II appeal since, if Plaintiff prevailed on appeal of the earlier rate years (1978–80) those findings would be applied to the rate year for 1985. It is undisputed that, for the first half of 1985, Plaintiff was granted a lease pass-through rate. For the second half of the 1985 rate year, however, the pass-through was not granted since, in January of 1986, the lease pass-through was allegedly repealed. To the extent that Plaintiff disputed the issue of whether or not the provision was in fact repealed, it should have appealed the DMAHS's finding by filing a Level II administrative appeal. Presumably, Plaintiff's initial failure to file a Level II appeal in reliance upon the DMAHS's assurances that no appeal was necessary, did not prej-

udice its rights to appeal the recalculation of the rate for the year 1985.[6]

### III. *Attorney's Fees, 42 U.S.C. § 1988*

■ If Plaintiff thought it was entitled to attorneys fees for the proceedings in state court, it should have petitioned that court for such an award. Plaintiff cannot, at this time, seek to recover fees for the proceedings conducted before the Appellate Court. *see Blow v. Lascaris,* 668 F.2d 670 (2d Cir.1982) *cert. denied* 459 U.S. 914, 103 S.Ct. 225, 74 L.Ed.2d 179 (No valid cause of action exists for award of attorneys fees to prevailing parties in proceedings relating to the vindication of civil rights in the context of a state administrative proceeding where recourse to federal court on the merits of the claim is not necessary or available.) Clearly, since Plaintiff was not forced to appeal the findings of the Appellate Division, they have no basis to recover attorneys fees.

Moreover, as the Appellate Division noted itself, the prior adjudication was not dispositive on the issue of § 1983; "[W]e do not decide appellant's alternative argument that DMAHS's unlawful adoption of its so-called policy and subsequent denial of relief to appellant violated appellant's Federal Civil Rights, 42 U.S.C. § 1396(a) and § 1983." 215 N.J.Super. at 484, 522 A.2d 442. Since their was no adjudication on the merits of Plaintiff's § 1983 claim, there can be no recovery for attorneys fees. *See Kentucky v. Graham,* 473 U.S. 159, 171, 105 S.Ct. 3099, 3108, 87 L.Ed.2d 114 (1985).

Finally, Plaintiff is not entitled to attorneys fees in connection with the present proceedings because it has failed to establish a cause of action under 42 U.S.C. § 1983 for any rate year subsequent to 1980.

### IV. *Equal Protection*

■ Plaintiff alleges that DMAHS has violated and continues to violate its right to equal protection under the law by granting hardship relief to other nursing homes while refusing to grant the same relief to the Plaintiff.

It is well established that, where a plaintiff raises an equal protection claim based upon a state official's allegedly discriminatory enforcement of a facially neutral law or regulation, plaintiff must prove "intentional or purposeful discrimination" on the official's part. *E & T Realty v. Strickland,* 830 F.2d 1107, 1113–14 (11th Cir. 1987). Courts have held that, "Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause." *Shango v. Jurich,* 681 F.2d 1091, 1104 (7th Cir.1982).

Therefore, Plaintiff must establish that the DMAHS intentionally discriminated against it by refusing to grant Plaintiff a lease pass-through rate or other hardship relief. Plaintiff has not proffered any persuasive evidence which would justify an inference that DMAHS deliberately discriminated against the Plaintiff when it declined to grant Plaintiff hardship relief.

Defendants, however, have provided a rational basis to justify their actions. For the years 1978 through 1980, Defendants maintain that the DMAHS was simply following department policy, which at that point was not deemed unlawful. Even if Russo acted unreasonably, however, (which, as I concluded above, he did not) Plaintiff has not established that he intended to discriminate against the Plaintiff.

With respect to the "closed" rate years (1981, 1982 and 1984) there was no purposeful discrimination since Plaintiff failed to preserve its right to administrative review of the DMAHS's rate.

In the years following 1986, Plaintiff has also failed to establish that DMAHS intentionally discriminated against it by refusing to grant it hardship relief. Plaintiff has not effectively countered Defendants' assertions that; (1) the lease pass-through provision is no longer in effect since it was repealed in 1986; and (2) Plaintiff is dissim-

---

**6.** I dealt with issues similar to those raised in this case in *Balzano v. Township of North Bergen,* 649 F.Supp. 807 (D.N.J.1986). Relying on *Stana v. School District of City of Pittsburgh,* 775 F.2d 122, 130 (3d Cir.1985), I concluded that an administrative body's substantive mistake in applying a law which provided for payments to a plaintiff did not give the plaintiff a federal claim as long as state remedies were available. 649 F.Supp. at 813–14.

ilar to the facilities which it alleges are currently receiving hardship relief and, therefore is not entitled to such relief.

In the absence of intentional or purposeful discrimination, Plaintiff cannot support a cause of action under the equal protection clause. Moreover, Defendants' rational explanation serves to justify its actions. Thus, *see Port Chester Home v. Axelrod*, 732 F.Supp. 440, 446 (S.D.N.Y.) (rejecting nursing home's claim that New York Medicaid agency violated its equal protection rights by failing to reimburse it for its actual lease costs: "To defeat plaintiff's equal protection claim defendants must do no more than articulate a rational reason for the distinction about which plaintiff complains.")

## CONCLUSION

Defendants' motion for summary judgment is granted; Plaintiff's Amended Complaint is dismissed. Plaintiff's cross-motion for summary judgment is denied.